By the Court. Sandford, J.
The plaintiff claims to recover the fees payable by law, for the services rendered in his office, and received by the treasurer of the city since the first *361 day of January, 1848, on the ground that the act of December 10th, 1847, conferring those fees on the city and county, and providing the clerk with an annual salary, is unconstitutional. Two objections are made to the validity of this statute.
First. It is said, that it violates the provision of the constitution, which provides that “ no private or local bill which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in the title. (Art 3, § 16.) The duty of pronouncing a statute uncónstitutional, is always one of great delicacy; and courts should not exercise .that grave function, except where the point is entirely clear. The decision of such cases becomes more than usually difficult, when the objection rests upon the forms of legislative action.. If we should be satisfied that this act is not in compliance with the constitution, in the matter alleged, we then encounter another embarrassing question, what is the consequence upon the validity of the statute ? Is it all void, or is so much of it valid as is not private or local, or is fully expressed in the title ?
We have no doubt, in the first place, that this act is not a private act. Then is it local ? It relates to the city and county of New York, embracing nearly one-sixth of the population of the state. Perhaps the extent of the city is not, of itself, a decisive criterion. But testing it by taking any county in the state. Is a statute which relates to a whole county, local ?- Certainly such an act is not within the mischiefs which this provision of the constitution was intended to remedy. It was aimed at “log-rolling,” a well known process by which bills to promote individual interests, and mere neighborhood projects, often at the expense of the people of a county at large, were combined together in order to aggregate a sufficient number of votes to carry them all through the legislature.
We may not be at liberty to repose our judgment on the fact, so obvious in this particular instance, that the act is one which was calculated to enlist against its passage a formidable combination of individual and personal interests. But having regard to the objects of the act, which are as public in their nature as any conceivable legislation falling short of the whole state, and considering the very serious difficulties and embarrassments *362 which would grow out of a decision that statutes affecting this city are local acts ; we do not feel warranted in holding, that the act in question is local, within the meaning of the constitution. We observe several statutes of great public importance, enacted the same year, which are obnoxious to the same objections ; but their validity has never been doubted.
As to the analogy derived from the language of the constitution in speaking of “local officers,” an officer may be local, in the sense and for the purposes of that provision, and yet a statute respecting the duties and fees of the same office may be public and general.
We have looked into the statute before us sufficiently to say, that if it be a local act, it is not so clearly repugnant to the provision in the constitution, as to call upon us to declare it invalid for that cause. The subject is the fees and compensation of county officers. In effecting the requisite changes, the act necessarily treats of some matters incidental to the discharge of the duties for which fees are to be exacted from one class of persons, and Compensation made to another. This can scarcely be said to constitute a distinct subject*
So in regard to the expression of all the subjects in the title* It cannot be requisite to mention in the title of the act, the various details which are necessary and yet incidental to carrying out the principal subject intended. Such a practice would make the title so voluminous, that it would cease to be a title, in its proper sense.
Upon the whole, we repeat that we do not find sufficient force in the reasons urged against the validity of this act, to pronounce it unconstitutional, on the first ground maintained in behalf of the plaintiff.
The next point of the plaintiff is, that the act in question is unconstitutional; because it deprives him of his property, without authority, and without compensation. The fees, perquisites, and emoluments of the clerkship of the city and county of New York, (it is argued,) are the absolute property of the plaintiff.
The plaintiff’s right to the clerkship is reposed on the charter of the city and the constitution of the state.
The history of this clerkship is very well stated in the *363 opinion of the chancellor, in Warner v. The People, ex rel. Conner, (2 Denio. 272,) and we will therefore advert to it very briefly.
In Gov. Dongan’s charter, granted to the city in 1685, the corporation was authorized to have, among other officers, a town clerk, which office was conferred by the charter upon John West. His duties were not defined, except that he was to execute all things which belongs unto that office. In a subsequent part of the charter, West was declared to be .constituted and appointed to be the present town clerk, clerk of the peace, and clerk of the court of pleas, .to be holden before the mayor, recorder, and aldermen. (Kent’s City Charter, 9, 12, 17.)
In Governor Montgomery’s charter, January 15th, 1730, there was granted to the city to have, among other officers, one common clerk. A court of general sessions, and a court of record of pleas, (which was afterwards called the mayor’s court,) were conferred upon the corporation.; and the mayor, recorder, and-aldermen were made justices of the peace. Section 29 again granted a common clerk, with the powers and duties of common clerks of boroughs in England, who was to be -clerk of the court of record, and clerk of the peace and the general sessions. The charter appointed William Sharpas to the office for life, * and reserved the power of appointment to the governor of the province. (Kent’s Charter, 42, 73, 74.) Before this period, by the act of October 3, 1710, (1 Van Schaack, 83,) deeds and conveyances were permitted to be recorded in the office of the secretary of state, or in the county records. Under this act, the town clerk, and after 1730, the common clerk of the city, which was then co-equal with the county in territory, recorded deeds and conveyances.
Thus, it will be seen, that for nearly half a century before the constitution of 1777, the duties of the common clerk of the city of New York were those now performed by the clerk of the common council, the clerk of the oyer and terminer and general sessions, the register of deeds, and the clerk of the city and county. The officer whose duties are now most nearly coincident with those usually performed by the ancient common «lerk, is unquestionably the .clerk of the .common council. The *364 constitution of 1777, while it sustained all existing charters to bodies politic, gave the power of appointment which in those charters was reserved to the governor, to the council of appointment, and made the tenure of this office to be during pleasure. (Art. 23, 28, 36.) After the resolution, a great many new duties were imposed upon the clerk of the city and county, in common with other county clerks, by various legislative acts ; and we may here remark, that the constitution of 1846, and the legislation under it, have essentially changed the functions of the office. Its most important duties at this time, are those which, till July, 1847, were performed by the registers and clerks of the court of chancery and the supreme court. This last and most essential change, has occurred since the plaintiff was elected, in pursuance of the constitution adopted at the same time that he was chosen.
To return to the history of the common clerk, it is true that in the statutes divesting him of his functions, from time to time, he is described as the clerk denominated in the charter the common clerk, now usually called the clerk of the city and county of New York; but it will be seen that the resemblance was at last nearly annihilated. On the 27th of March 1807, ' the clerkship of the common council was taken from the clerk of the city and county by the legislature, and the appointment vested in the common council. (5 Laws of New York, Webster’s Ed. 91.) On the 11th of March, 1808, the legislature created a new clerkship of the oyer and terminer and general sessions of the peace in the city and county of New York, taking the former from the clerk of the supreme court, and the latter from the clerk of the city and county. (5 Ibid. 265.)
The first general compulsory recording act in this city, (Laws of 1811, 6 Webster’s, 184,) directed the conveyances to be recorded in the office of the clerk of the city and county, where deeds for the purpose of evidence had been recorded for a century before, and where bargains and sales were required to be recorded by the act of 1810 ; but in the revision of the laws in 1813, the office of register of deeds was carved out of the county clerkship, and the duty of recording deeds, conveyances, and *365 registeringmortgages, was imposed upon the register exclusively. (2 R. L. 402, § 159.)
By the city charter, the common clerk was the clerk of the peace. By an act passed April 9th, 1811, regulating the police of the city, the special justices, with the mayor’s approval, were authorized to appoint an assistant clerk; (6 Webster’s Laws, 290;) and in the revision of 1813, the police office was expanded, and this officer became the clerk of the police. (2 R. L. 350, § 24.)
Finally, the constitution of 1821, provided that the clerks of counties, including the clerk of the city and county of New York, should be elected by the people in their respective counties, and hold their offices for three years. (Art. 4, § 8.)
In process of time, the court of pleas of the city underwent an entire change, so that long before the plaintiff’s election, the charter officers of the city ceased to act as judges of that court, and instead of the majmr’s court, it became the court of common pleas, and in its civil jurisdiction, is no longer founded upon the charter.
The result of this historical inquiry, is to show that the clerk of the city and county of New York, became an officer appointed by the state government at the revolution ; by the constitution of 1821, he became elective by the electors of the city; that by the gradual progress of legislation, in part at the instance of the municipal authorities, and where otherwise, acquiesced in and unquestioned, the duties of the common clerk of the charter (whose name the clerk of the city and county enjoyed for a time, as a synonim,) were distributed among several new and distinct officers ; and in 1846, the clerk of the city and county, had become an officer deriving no authority from the city charter, performing no duty exclusively under its provisions, and indeed, performing under the statutes, fewer of the duties, which, by the charter, belonged to the common clerk, than were in 1846 performed by either the clerk of the sessions, or the clerk of the common council. He has not inherited the name of the clerk of the charter, much less his tenure or his functions. In 1846, he was a county clerk, not a mimicipal officer, under the charter. Except that he was not clerk of the *366 circuit, the oyer and terminer, or the sessions, and could not record deeds and mortgages, he was in every respect like the county clerks of the other counties in this state. We must, therefore, lay out of view the city charter, and all the vested rights supposed to be derived from that instrument.
The remaining branch of the plaintiff’s general proposition is correct; this clerkship was and is secured to the incumbent by the constitution of the state. We regard the plaintiff as holding an office under that instrument, secured to him for three years, beyond the control of the legislature—an office, of which the duties and emoluments are defined and regulated by law. It was determined in our highest court, in Warner v. The People, (2 Denio, 272,) that the act of 1843, taking from the plaintiff his duties and emoluments as clerk of the common pleas, was unconstitutional and void, because those duties appertained to the office of clerk of the city and county, and were part of the latter; not so much because the act infringed on the plaintiff’s vested rights, as because the new officer was to be appointed by the court, instead of being elected by the people, (See the opinions, page 281, 284, 286, and in the supreme court, 7 Hill, 81.) If the act of 1843, had directed the new clerk to be elected by the people, we have no assurance that the law would have been adjudged invalid. The case of Warner therefore, does not aid us in setting limits to the power of the legislature, to control the duties and the emoluments of officers, who hold under a constitutional creation and tenure.
The plaintiff’s propositions are as follows:
“ II. It is not necessary to argue that the legislature have no power, for great govermental purposes, to raise, diminish or abolish the fees of this officer, to substitute a fixed salary for fees, or to abolish the office altogether; because the act in question does neither of these.
“ III. The fees, perquisites and emoluments, of the clerkship of the city and county of New York, are the absolute property of the plaintiff.
“ IY. The act in question takes this property from the plaintiff, and gives it to the defendants; which the legislature have no power to do.
*367 “ V. If the legislature would otherwise have such authority, the constitution of the United States prohibits its exercise.”
In considering these propositions, our first inquiry will be, what is the nature and the extent of the right in a public office, Which is vested in the incumbent?
We were referred to several leading cases, deciding statutes to be unconstitutional which invaded private vested rights of property, or the chartered rights of corporations, which though, operating extensively on public interests and public convenience, were nevertheless private corporations aggregate. The former proceeded, sometimes on the ground that the legislature, not having the omnipotence of the parliament in England, could not take the property of one man and give it to another, although there were no constitutional inhibition against such an act of tyranny; at other times, they have been placed on the provision in the constitution, that no man shall be deprived of his property without due process of law.
' The decisions in the cases of corporations, quasi public, have had the further ground, that the contested statutes impaired the obligation of contracts, and thus infringed the constitution of the United States. In the most celebrated of them all, the Dartmouth College case in 4 Wheaton, the distinguished counsel who attacked the statute, drew, in pointed terms, the distinction between rights vested by such a charter in a private corporation, and those which were held by a public officer or a public corporation ; and it is emphatically maintained by Chief Justice Marshall and Mr. Justice Story. And although the rights of private corporations, vest upon contract, and are thus protected, they must yield, when the great exigencies of the public and of the government require it; as is shown in the Charles River Bridge case, 11 Peters’, 420 ; the Tuckahoe Canal Co., 11 Leigh, 42; and the Harlem Rail Road case, 3 Sand. Ch. R. 625. These decisions do not advance us in our inquiry as to the nature of the right in'question. They may be analogous, if we find it to rest upon contract, or to constitute private property.
An office is a right to exercise a public or private employment, and to take the fees and emoluments thereunto belonging. *368 (2 Black. Com. 36.) And a public officer, is every one who is appointed to discharge a public duty and receives a compensation for the same. (Per Best, Ch. J., in Henly v. The Mayor of Lyne, 5 Bing. 91.) Many of the ancient executive and ministerial offices, known to the English law, were inheritable and assignable, and were treated as incorporeal hereditaments. But judicial offices, and offices of trust pertaining to the administration of justice, could not be so held, (2 Black. 636; 9 Coke, 47, 48.) And the doctrine is limited in England to ancient common law offices, which depend chiefly upon usage. Those of modem origin, are governed by the statutes creating them, and confer no life estate or irrevocable tenure, unless expressly given. (Smyth v. Latham, 9 Bing. 692. And see Hardres’ R. 356, 357, per Ch. Baron Hale.)
In this country, there are no inheritable offices, nor any depending upon ancient usages or customs. All public offices emanate from the people, and are governed by the constitutions and the laws. Their tenure is defined by the one or the other; and when no tenure is expressed, the officer holds during the pleasure of the appointing power. (See Ex parte Henner, 13 Peters’, 230, 260.)
Public offices, in theory at least, are held and exercised for the benefit of the community, and not for the benefit of the incumbent, save as the compensation is incidental to the public service. Hence, it is only where the constitution defines the tenure, the mode of appointment, or the compensation, that the legislature is precluded from altering either, or from abolishing the office itself.
The case of Warner v. The People, (2 Denio, 272,) illustrates the force of the constitutional restriction in respect of the mode of appointment. The People v. Garey, (6 Cow. 642, affirmed in error, 9 ibid. 640,) decided, that where the constitution fixes the term of office, it cannot be shortened by a statute, directly or indirectly; and the same point was determined in Pennsylvania as to compensation when fixed by the constitution, in the Commonwealth v. Mann, (5 Watts & Serg. 403;) and in Arkansas, in Ex parte Tully, (4 Arkansas R. by Pike, 220.)
*369 On the other hand, where an office is created by a statute, it is wholly within the control of the legislature. The term, the mode of appointment, and the compensation, may be altered at pleasure, and the latter may be even taken away, without abolishing the office. Such extreme legislation is not to be deemed probable in any case, but we are now discussing the legislative power, not its expediency or propriety. Having the power, the legislature will exercise it for the public good, and it is the sole judge of the exigency which demands its interference. (See 2 Peters’ R. 412; 1 Baldw. C. C. R. 74.) As illustrating these principles, we will hereafter refer to several authorities in different states of the Union.
If the office itself be secured l^r the constitution, and the compensation be left to the legislature, it may be increased or diminished, so as to affect the/ incumbent, whether the compensation be by fees or by salary, as the public good may require. This was asserted in terms or in effect by all the judges who delivered opinions in the case of Warner v. The People, and is not contested by the plaintiff’s counsel.
We have, therefore, these positions for our future argument. When an office is created by the constitution, and defined as to term and salary, the people in their sovereign capacity may, by a new constitution, terminate both, without regard to the rights, the interests, ,or the expectations of the" incumbent. This was done in our constitution of 1821, and again in 1846, in respect of the judiciary; a branch of the government, which it has been the wise and uniform policy of our states and nation to render more independent than any other. In each instance, the judges were holding for unexpired terms, fixed by the former constitutions. An office created by law, may be repealed by law, without regard to the term or future salary of the officer intrusted with its exercise. Offices created by the constitution, the tenure and compensation being fixed by a statute, are equally within the legislative control as to such tenure and compensation ; except that the office could not be virtually abolished by a colorable reduction of the compensation, or by taking it away altogether.
(This exception is a sufficient answer to the argument in *370 "behalf of the plaintiff, that the act in question is in effect a removal from his. office. It was not alleged, that the fees were not amply sufficient to pay all the salaries and expenses charged upon them by the act. The latter cannot therefore be subjected to the imputation of effecting an indirect removal, by destroying the compensation.)
Such being the nature of a public office, what is the right which the incumbent has in the office, or in the emoluments attached to • it ? The plaintiff treats this right as constituting property, in the sense in which we speak of private. property; and contends, that he accepted the office, and entered upon its duties, under an implied contract, or a compact well understood, that he might hold and enjoy such emoluments during his official term.
It was said by the court, in one of the authorities cited by the plaintiff’s counsel, that the right to exercise an office, is as much a species of property as any other thing capable of possession j and in an elective office, the election confers the right. (Wamack v. Holloway, 2 Alabama R., N. S., 31.)
. In that case, this remark was rather a figure of speech than a judgment, determining an office to be property. It was a strong mode of expressing the right which one elected to an office has to hold and enjoy it, as against all intruders and unfounded claims ; which is as perfect a right, beyond doubt, as the title of any individual to his property, real or personal. But the nature of that right, and its liability to control by legislative action, is quite a different thing. The supreme court of North Carolina has, however, decided that ah. office is the property of the incumbent, in a case which we will presently mention more at large. (Hoke v. Henderson, 4 Devereux’s Law R. 1 and 17.)
To resume the argument; we think it must be assumed that there is no contract, express or implied, between a public officer and the government, whose agent he is. The latter enters into no agreement, that he shall receive any particular compensation for the time .he shall hold office ; nor in the case of a statutory office, that the office itself shall continue any definite period. Where the constitution limits the compensation, it is beyond legislative control ;• but that makes no contract. The *371 people have the control, in their sovereign capacity, as the legislature has in statutory offices. It is not the question whether fees or salary earned may be divested* The right to receive such fees may be conceded as perfect, Without affecting the present inquiry.
On the part of the officer, there is still less in the nature of a contract. Whether he hold under the constitution, or a statute, he is under no obligation to continue to discharge his duties a single day. He may resign at any time, and no power of the government can prevent him. (United States v. Edwards, 1 McLean’s R. 467.) The legislature may attach penalties to the refusal to serve in a public station ; but that does net afifect the question.
Chief Justice Marshall, in the Dartmouth College Case, (4 Wheat. 627, &c.,) said in substance, that public officers are not within the inhibition of the constitution of the United States against laws impairing the obligation of contracts ; that the inhibition does not extend to offices within a state for state purposes ; that the legislature must necessarily control such offices, •and may change and modify the laws concerning them, as circumstances may require; that grants of political power, to fee employed in the administration of the government, are to be regulated by the legislature of each state, according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.
In the same case, Mr. Justice Story said, “ The state legislatures have power to enlarge, repeal or limit, the authority of public officers in their official capacity, in all cases when the constitution of the states respectively do not prohibit them; and this among others, for the very good reason, that there is no express or implied contract, that they shall always, during their continuance in office, exercise such authorities. They are to exercise them only during the good pleasure of the legislature.”
Judge Story proceeded to compare the duty of a public officer to a naked power, which is revocable at pleasure.
In the Commonwealth v. Bacon, (6 Serg. and R. 322,) the mayor of Philadelphia denied the validity of a corporate law, enacted during his term, by whish his salary was reduced, on *372 the ground that his acceptance of the office created a contract between him and the city, that he should be paid the compensation then established, while his term continued. The court decided it was not a contract, and that the law was valid. In their opinion, the court say that services by a public officer do not partake of the nature of contracts, or bear any affinity to them; and that the allowance to the officer, whether it be annual, daily, or by fees, depends upon the will of the law makers. They refer to the constitutional inhibition in Pennsylvania against reducing the salary of the governor and the judges, (which is similar as to that as to judges in our constitution,) as showing that in all other cases, the legislature may change the compensation of officers whenever it is deemed just and expedient to do so.
In Chenzeller v. The Union Canal Company, (1 Rawle, 181,) the plaintiff had served as secretary of the company from 1816 to 1821. There was no specific term of office. In March, 1819, the legislature, by law, provided that no compensation should be thereafter allowed by the company to any of its officers, until its public works should be re-commenced. This had not been done, when the plaintiff sued for his salary to May 1821. It was decided that the plaintiff could not recover, as he was free to continue as secretary, or to withdraw, after the passage of the act. .
In Banker v. The City of Pittsburgh, (4 Penn. State Rep. by Barr, 49,) the plaintiff had been appointed collector of tolls by the corporation of that city, with an annual salary, and was required to give an official bond. During his term, the city, by ordinance, stopped his salary, because the tolls yielded too little to make it their interest to proceed in the concern. The court decided, that there was no contract, express .or implied, for the permanence of the salary, and that the plaintiff could not recover any compensation for the period subsequent to its discontinuence
In The People ex rel. Enloe v. The Auditor of Public Accounts, (1 Scammon’s R. 537,) where the legislature of Illinois, in July 1837, abolished the office of warden of the penitentiary to which the relator had been appointed for two years in Febru *373 ary preceding, and the salary for the two years had been appropriated by law, he contended that he had a vested right to his salary for his whole term, and that the repealing act violated a contract, both of which objections to the act were overruled by the court. In respect to an office reposing on a constitutional tenure, the legislature may, by statute, require security to be given, on pain of the office being declared vacant. (Treasurers of the State v. Taylor, 2 Bailey’s R. 524.)
In the case of The State v. Dens, (R. M. Charlton’s Rep. 397 to 443,) Judge Nicoll in the superior court of Georgia, decided that an act of the legislature, taking away from a sheriff the custody of the jail and the appointment of a jailor in his county, and conferring it on a municipal corporation, was a valid act, and that it did not divest the sheriff of any proprietary right, nor impair the obligation of any contract. The judge examined the subject of the rights of public officers, with great ability, and more at large than it has been done in any case which has come under our observation. His argument leads inevitably to the results which he maintained—first, that public officers under our government, have no proprietary interest in their offices; and second, that there is no contract between them and the government, that their duties and the rights flowing from their discharge, may not be changed during their continuance in office.
The North Carolina case before mentioned, stands out in strong contrast to the Georgia authority, and indeed to every published decision and opinion on the subject which we have seen. It was there decided, that an act providing that clerks of the courts in the respective counties should be chosen at the ensuing election by the electors of such counties, was unconstitutional, because it displaced the clerks then in office, and who were holding: during good behavior, under a prior act of the legislature. The clerks were recognized as officers in the constitution, but that instrument contained no provision as to their tenure, or their mode of appointment. The simple statement of this decision, will strike with surprise the mind of every person who has been accustomed to observe the legislation in this state on the subject of public officers.
*374 The supreme court of North Carolina, held, on the strength of the common law doctrine of offices, that the office of clerk was private property in the incumbent, to the extent of the emolument which he was entitled to receive from it; and was protected by the clause in the bill of rights providing that no freeman shall be deprived of his property except by the law of the land. That a statute which deprived one person of a right, and vested it in another, is not a law of the land. The court conceded in its argument, that it was competent for the legislature to abolish the office itself, to increase its duties and responsibilities, and to diminish its emoluments, as the general welfare might dictate; and that the office was to be deemed as having been conferred and accepted, subject to such regulation. But the court denied that the legislature could take the office from one and give it to another, which it held was the effect of the statute under advisement. It also denied that it was in the power of the legislature, after prescribing an official term, to alter or abridge it, so as to affect a person holding the office at the time of such alteration. This, it will be perceived, is not in accordance with the authorities heretofore cited.
It appears to us, with much respect for the learned tribunal which pronounced this judgment, that it was unduly influenced by the common law rule derived from prescriptive offices, and operating in a government whose genius and spirit are perhaps in no respect more unlike ours than in this very subject, the source and nature of the rights and interests acquired by public officers. In enumerating the qualities of an office, eonsiderd as property, the court admitted that it was inalienable, and in many instances incapable of being managed by a substitute j and in the only point giving it the semblance of value, subject entirely to legislative control. If to these be added, the consideration that it is a political agency, and not like a private contract of hiring for a definite period, We think that there will remain no incident of property in its correct signification.
Upon the whole, these authorities, with the nature of the' duties and employments of a public officer, seem to us conclusive to show that such an officer has no property in the prospective *375 compensation attached to his office, whether it be in the shape of salary or of fees.
The same cases and the same considerations, are equally conclusive against the argument, that the officer’s right to such future compensation is upheld by any contract, express or implied.
We have seen, that a constitutional officer, holds by a tenure independent of legislative control, so far as the constitution prescribes ; but this is by force of the paramount public law ; and the power Avhich made the constitution, may control such office, at pleasure, regardless of supposed vested rights and implied compacts existing in favor of the incumbent. We have cited some strong illustrations of the like complete authority of the legislature over public offices which are created by statute ; and we fully assent to the principle maintained by those decisions.
In our opinion, a public officer is an agent, elected or appointed to perform certain political duties in the administration of the government. The legislative power prescribes those duties, and gives to the officer such compensation for their discharge as is deemed just. The same sovereign power Avhich prescribes the duties, may alter them at pleasure. It may increase them without enhancing the compensation.' (Andrews v. The United States, 2 Story, 202.) In like manner, the same power may diminish the compensation, without lessening the duties. If the officer receive fees, it may abolish some, reduce others, or take away all, and compensate him by a salary. His right to the emoluments of the office, is held subject to all these modifications. All these consequences floAV from the political character of the agency, and the supremacy of the government in regulating it for the public good.
The plaintiff’s counsel conceding the power of the legislature .to regulate fees, for great governmental purposes, deny that it can substitute a salary for fees, and at the same time continue the fees for the benefit of the city treasury.
We cannot find any good reason for this distinction. If the legislature may abolish some fees, and reduce the residue, and may substitute a salary for the fees, the power seems to embrace *376 the whole interest of the officer in the subject matter; and it can be of no consequence to him whether the fees continue to be paid, or to whom they are paid. He receives the proper reward for his services, graduated by the legislative discretion. It is difficult to perceive what further interest he has in the affair beyond that of every citizen.
It is true that the term fees properly signifies certain allowances to officers as a recompense for their labor and services. But we have had many instances of fees which did not come to the benefit of the officer for whose services they were paid. One of long standing, is that of the fees payable to the Secretary of State, which go to the treasury. The justices of this court, during the year preceding the code of procedure, were required to perform duties, for which fees to a large amount were received by the clerk, and paid to the treasury of the city. The constitutionitself recognizes this class of fees, (Art. 6, § 20,) and shows, that although they are a compensation for official services, it does not follow that the state may not receive them, and recompense its agent in another mode and at a different rate
It will scarcely be questioned that the legislature now sitting, may create a special judge in this city, to have jurisdiction of writs of habeas corpus and certiorari, summary proceedings against fraudulent debtors, and the like; for which he shall be entitled to demand the same fees that were formerly paid to justices of this court, such fees to be paid to the city treasury, and the judge to receive an annual salary/rom the city. And if this may be done in respect of a new office, why not in respect of one existing, in which the whole subject of fees and compensation is wholly within the legislative control?
It is clear to us, that while the state may compensate by salaries, its officers concerned in the administration of justice, it may at the same time, require its citizens, who have occasion for the services of such officers, to pay certain fees for the same. This is simply paying an agent a gross sum, while those for whom he transacts the business of the state are required to pay to the state a fixed price for each service rendered.
In the case of the register of deeds, pending before us on *377 nearly the same point, it is urged that the act in question imposes a tax upon citizens who may require these services$ and it is unconstitutional because it does not specify the object to which the tax shall be applied. We do not perceive any resemblance to a tax, in these fees paid by citizens for the promotion of their private ends.
It is not necessary for us to notice all the extreme cases put by the learned counsel for the plaintiff. This statute does not transfer the fees to a stranger, or to a mere corporation. They are conferred upon the city and county of New York, a political community of nearly half a million of people, for the public benefit.
We have no evidence, nor indeed was it pressed, that the annual salary allowed to the clerk is illiberal; much less that it is so small as to cause him to vacate his office. Its apparent hardship consists in discontinuing during the residue of his term, the large remuneration attached to the office when he entered upon its duties. It is not our province to vindicate the propriety of legislation, which thus deprives an officer of great trust of the principal profits, which, relying upon the stability of the laws, he had good reason to expect would continue during his term, and upon the faith of which he may have relinquished valuable pursuits in order to take upon himself the discharge of its duties.
We might think it far more just, that such laws should be made to operate prospectively ; but our duty is to declare the law, not to make or unmake it ; and we feel bound to say, that we believe this act was a valid exercise of legislative power. There are numerous instances of similar statutes, of which we will mention some of the most striking.
In May, 1842, congress, by an act applicable to persons then in office, limited the compensation of district attorneys, marshals, and circuit and district clerks; and required them to pay the surplus of their fees, into the treasury of the United States. The district attorneys and marshals hold office for a term of years; and it is a well known historical fact, that the fees in this district of all the officers named, had for several years, amounted to many times the sums fixed for the respective sala *378 lies by the act. (Acts of Congress of 1842, ch. 29, § 1, No. 167.)
The district attorneys of the respective counties in this state were, until 1847, appointed for terms of three years. Yet a series of acts were passed by the legislature, commencing in 1838, by which in all but the smallest counties, those officers, were deprived of their fees, and put upon annual salaries, amounting to far less than their former compensation; and such acts were applied to those then enjoying the appointments.
This course of legislation, and the acquiescence of the numerous intelligent and influential persons affected by it, tend to strengthen the argument in favor of entire legislative control, derived from the nature of public officers and their relation to the government.
Judgment for the defendants.