B. S. HEAD, Appellant, *v.* THE CURATORS OF THE UNIVERSITY OF THE STATE OF MISSOURI, Respondents.

1. *Contracts — Constitution — Act of 1859, vacating offices in the University of the State of Missouri, did not impair the obligation of a contract.* — In a suit against the University of the State of Missouri, for salary claimed to be due plaintiff, it appeared that he had been elected to fill an office made vacant by the act of 1855 (R. C. 1855, p. 1502, § 24), for a term of six years, "subject to law;" that by the act of December 17, 1859 (Sess. Acts 1859–60, p. 91), all the offices of professors, tutors, and teachers connected with the university, including his own, had been declared vacant. *Held,* that the act was not unconstitutional as impairing the obligation of a contract.

The university was a public and not a private corporation. There were no grantees named in the act creating it (Sess. Acts 1838–9, p. 176), and consequently no parties either to accept or reject the grant. Under it the State entered into no compact with private parties; the private contributions given to secure its location did not make the contributors founders of the university; nor did the contributions alter the character of the institution.

Being elected, plaintiff did not hold his office by virtue of a contract with the university. He was an officer, and not an employee, of the institution.

Being elected "subject to law," he was subject both to existing laws and such laws as the Legislature might thereafter enact.

*Appeal from Fourth District Court.*

*B. S. Head,* for appellant.

The acts pleaded in bar impair the obligations of a contract; are retrospective, and therefore violations of the constitutions of this State and of the United States. (Allen v. McKeen, 1 Sumn. C. C. 314 ; Dartmouth College v. Woodward, 4 Wheat. 518 ; Louisville v. Louisville University, 15 B. Monr. 674 ; 7 Gray, Mass., 33 ; St. Johns College v. The State, 15 Md. 373–4.)

Although the university may be a public corporation and its curators public officers, still the teachers employed by these curators, like the teachers in the public district schools, are mere servants and employees for hire. (15 B. Monr. 728.) They are not necessarily citizens of this State or of the United States, and not usually even required to be qualified by official oaths. From the nature of their employment they are favored, and contracts for their services are construed by the courts to be under the protection of the United States constitution, without regard to the

nature of the schools in which they are engaged. (See Allen v. McKeen, *supra* ; Dartmouth College v. Woodward, 4 Wheat. 654, 583 ; 15 B. Monr. 728.) The word "contract" is used in connection with the tenure of professors in the original charter of the university (Sess. Acts 1839, p. 181), and in the amended charter (R. C. 1855, p. 1503, § 30). Even in the case of a public officer, he can claim protection under the constitution of the United States for his contract to hold his office and recover its emoluments for the period of his appointment, subject, however, to the legislative power to abolish the office, or to subject it to any modifications or changes. A distinction is to be drawn between that legislation which respects the office itself and that which aims alone at the incumbent. (Const. Mo. 1856, art. II; 1 Stark. Ev. 217; 7 Ohio, 82 ; Fletcher v. Peck, 6 Cranch, 87 ; State v. Fry, 4 Mo. 187 ; *id.* 194 ; 44 Mo. 570.)

The university is a private corporation. The funds for its foundation and support were originally contributed by Columbia College, itself a private corporation (2 Ter. Laws of Mo. 375), by divers private citizens and by the United States government. The funds given and the terms and objects of the gift by Columbia College are alone sufficient to constitute the university a private corporation. Its property was "vested in the State for the uses specified in the grant." (Sess. Acts 1839, p. 186, § 15.) It became a college — the only college — of the university, under the original statutes of its foundation, with the condition expressed in the law that it should not thereby lose its corporate existence. It thus constituted the nucleus around which the university was built. (Sess. Laws 1839, p. 178, § 27; *id.* 184, §§ 9–11 ; *id.* 186, §§ 13–15 ; 7 Gill. & Johns. 7 ; Edwards v. Jagers, 19 Ind. 407; Allen v. McKeen, 1 Sumn. 302 ; Dartmouth College v. Woodward, 4 Wheat. 518 ; Louisville v. Louisville University, 15 B. Monr. 674.)

The words "subject to law," in the resolution fixing the appellant's tenure, had no reference to any subsequent law. He was subject to all laws that the Legislature might afterward constitutionally pass, and a resolution of the board could not make him more or less so. The reference was to the law laid down in

the charter then in force, defining his duties, rights, and disabilities, and allowing him a trial, a hearing, and the privilege of testimony, without which he was not to be removed. (R. C. 1855, pp. 1502–3, §§ 24–30.) The law was part of the contract. (6 Cranch, 87 ; 4 Mo. 184.)

*Guitar & Prewett,* for respondents.

I. The State University of Missouri is a public corporation, subject alone to the government and control of the Legislature, upon whose will it depends solely for its existence and perpetuity; the curators being chosen by the Legislature, without any power to appoint their successors. (The University of North Carolina v. Maultsby, 8 Ired. Eq. 257 ; 5 Stew. & P. 17 ; 10 Leigh, 454 ; Dartmouth College v. Woodward, 4 Wheat. 518, 568.)

II. The Legislature has the power to alter or modify the law establishing and governing the State University, to create its offices and to abolish the same, to prescribe and change the tenure thereof, and to fix and allot their salaries; and these powers have been exercised time and again, without question or restraint, from the foundation of the institution. (Sess. Acts 1847, pp. 135–6 ; Sess. Acts 1849, p. 129 ; Sess. Acts 1851, pp. 294–5 ; Sess. Acts 1852, p. 171 ; Sess. Acts 1845, p. 7 ; Sess. Acts 1859–60, pp. 191–2 ; R. C. 1855, p. 1499, §§ 4, 24 ; Bush v. Shipman, 45 Scam. 190.)

III. The plaintiff held the office of "Professor of Mathematics" by election, and not by virtue of any contract with defendant; he could resign at will, and the State could remove him at pleasure. (Conner v. The City of New York, 2 Sandf., S. C., 355 ; R. C. 1855, p. 1502, § 24 ; State v. Davis, 44 Mo. 129 ; Prim v. City of Carondelet, 23 Mo. 22 ; Smith v. The Mayor of New York, 57 N. Y. 518.)

IV. Under the law by virtue of which plaintiff held the office of librarian, he could hold it only by the will of the board of curators. (R. C. 1855, p. 1500, §§ 10, 27.)

V. If defendant is entitled to the office he must get possession by a proper process, and earn the salary before he can recover

it of the defendant. (Smith v. The Mayor, 37 Mo. 518; State v. Auditor, 34 Mo. 375; 36 Mo. 70; Winston v. Auditor, 35 Mo. 146.)

VI. The donations made by the citizens of Boone county and Columbia College to the "building fund" of the university constitutes no part of its endowment, and was a mere bonus to secure its location. Its income and support are derived solely from public bounty. (3 U. S. Stat. at Large, 547, 591; R. C. 1845, p. 1031, §§ 21, 23.)

CURRIER, Judge, delivered the opinion of the court.

In July, 1856, the curators of the University of the State of Missouri "elected" the plaintiff to the professorship of mathematics in that institution. The election was for a term of six years, "subject to law." The salary attached to the professorship was $1,350 per annum. The plaintiff was also appointed librarian for a like term of six years, with an annual salary of $100. The term of office in each case commenced on the 5th day of July, 1856. The plaintiff accepted the appointments and discharged the duties of the respective positions for four years, and was paid for his services.

On the 17th day of December, 1859, the Legislature passed an act vacating the offices of all the "professors, tutors, and teachers connected in any manner with the university;" that is, it was enacted that the term of office of the parties named respectively should expire on the 5th day of July, 1860. It was also enacted that the board of curators should go out of office upon the election of their successors, according to the provisions of the same act. (Sess. Acts 1859–60, p. 91; see also the explanatory act of January 14, 1860, *id.* 92.)

The plaintiff rendered no service after the 4th of July, 1860. He avers, however, that he held himself in readiness to do so to the conclusion of his original term of office; that is, to July 5, 1862. This suit is brought to recover the salaries attached to the respective offices for two years, namely: from July 5, 1860, to July 5, 1862. In bar of the suit the defendants pleaded the acts of December 17, 1859, and January 14, 1860. The only

questions which it is necessary to consider relate to the constitutional validity of these acts. The plaintiff denies the right of the Legislature to control the university, and insists that the acts in question are in conflict with that provision of the constitution of the United States which prohibits the States from passing any law impairing the obligation of contracts.

Whether the university and its affairs are subject to the direction and control of the Legislature, depends upon its character as a corporation, whether public or private. If it is a private corporation, the Legislature has no control over its internal management. On the other hand, if it is a public corporation — a State institution — it is subject to the discretionary control of the law-making department of the State government.

The university is clearly a public institution, and not a private corporation. It was established by an act of the Legislature, which was passed February 11, 1839 (Sess. Acts 1838-9, p. 176). The act commits the government of the institution to a board of fifteen curators. The curators were not named in the act, but provision was made for their election by a joint vote of the senate and house of representatives. They were removable at the pleasure of the Legislature, and had no power to appoint their successors. (Sess. Acts 1838-9, p. 176, §§ 1-3.)

There are no named grantees in the act, and consequently no parties either to accept or reject the grant. In a word, the State entered into no compact with private parties. The State established an institution of its own, and provided for its control and government, through its own agents and appointees. The act creating the institution, in its first section, declares that a " university is hereby instituted in this State, the government whereof shall be vested in a board of curators." The university is then (§ 2) declared a " corporation and body politic" and invested with certain powers. These powers are given into the hands of a board which was made subject to the pleasure of the Legislature. This is not the way in which a private corporation is brought into being and endowed with corporate franchises. A private corporation involves the idea of private parties and private rights. No such parties or rights were concerned in the institu-

tion of the University of the State of Missouri. By establishing the university the State created an agency of its own, through which it proposed to accomplish certain educational objects. In fine, it created a public corporation for educational purposes — a State university. (Ang. & Ames on Corp., §§ 31–36; 5 Stew. & Port., Ala., 17; University of North Carolina v. Maultsby, 8 Ired. 257; Bush v. Shipman, 4 Scam. 190.)

The Legislature, by an act passed February 8, 1839 (Sess. Acts 1838–9, p. 184), appointed a board of commissioners to locate the university, and receive grants of land, as also bids from certain named "counties and from the citizens thereof for such sums of money" as might be offered to secure the location of the institution. Under this act, as the case shows, "private citizens of Boone county subscribed the sum of $108,000; and Columbia College, by its board of trustees, subscribed the buildings and apparatus, valued at $10,000, to the building fund of said university." It further appears that the university was located in Boone county, in "consideration" of the above mentioned subscriptions. In other words, the parties named contributed a liberal bonus to secure the location of an existing State institution in their county. But these contributions to the building fund did not constitute the contributors founders of the university. Nor did the contributions alter the "nature of the foundation, or change the character of the corporation." (University, etc., v. Maultsby, *ubi supra*.) Between this and the Dartmouth College case and the cases following that decision there is a broad distinction — namely, the difference that exists between a public institution of the State and a private corporation.

The statute (R. C. 1855, p. 1502, § 24) under which the plaintiff held in the university the office of professor of mathematics, made provision for the "offices" of president, professors and tutors and the mode of filling them. It then declares all these offices vacant on the fourth day of July, 1856. The defendant was subsequently elected to fill one of the "offices" thus made vacant by legislative enactment, his term of office commencing on the fifth day of July, 1856, as we have seen. The plaintiff acceded to the office in virtue of an election, and

not in virtue of a contract of hiring entered into between him and the university. He was an officer of the institution, and not a mere employee. He was elected, and for a term of six years, "subject to law." Whether these terms, "subject to law," referred to then existing laws, or to such laws as the Legislature might thereafter enact, it is not important to inquire. The plaintiff was subject to both classes of laws as regarded the length of his official term. He held an office in a public corporation, and it was competent for the Legislature to extend or shorten the term, or, if it should see cause, abolish the office altogether. That is the current doctrine on this subject.

In Connor v. The City of New York, the court say : "When an office is created by statute it is wholly within the control of the Legislature. The term, the mode of appointment, and the compensation may be altered at pleasure, and the latter may be taken away without abolishing the office. * * * Having the power the Legislature will exercise it for the public good, and it is the sole judge of the exigency which demands its interference." (2 Sandf. 369.) Again, it is said in Smith v. The Mayor, 37 N. Y. 520 : "An office is simply an appointment or authority on the part of the government to perform certain duties, usually at and for a certain compensation. Both the office itself and the compensation, upon general principles of law, are entirely within the control of the government to diminish, increase or abolish. So it may at any time be given up by the incumbent."

The plaintiff, in the case at bar, was not bound by contract to serve in the position of professor of mathematics for the full term of six years. He was at liberty to resign at any time and abandon the office altogether. He had the legal right to do so, and the State had the constitutional authority to change the duration of the term and limit it to four years, as it in fact did so. (Primm v. City of Carondelet, 23 Mo. 24.)

As regards the office of librarian it may be further remarked that the plaintiff held that position merely at the pleasure of the board of curators. The statute under which the plaintiff held that office so declares. (R. C. 1855, p. 1500, §§ 10, 27.)

The judgment will be affirmed. Judge Wagner concurs ; Judge Bliss not sitting.