## W. Cox, J. Ryan, and Joe Sitterlie v. The State.

1. CHANGE OF VENUE — CONSTITUTIONAL LAW. — Sect. 45, art. 3, of the Constitution of 1876 declares that "the power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law; and the Legislature shall pass laws for that purpose." *Held,* that the act of August 21, 1876, entitled "An act to provide for the change of venue by the State in criminal cases," was a legitimate exercise of the authority thus conferred upon the Legislature to regulate the manner in which the courts should exercise the power thus vested in them by the Constitution.

2. SAME — TITLE OF ACT. — Sect. 1 of the said act of 1876 enacts that the district judge may, of his motion, change the venue of any felony case to any county in his own or an adjoining district, if satisfied that a trial fair and impartial both to the State and the accused cannot be had in the county where the case is pending. *Held,* that the subject of this section is "expressed in the title" of the act, within the meaning of sect. 35, art. 3, of the Constitution of 1876.

3. SAME — JURY OF THE VICINAGE. — The Sixth Amendment of the United States Constitution guarantees a jury of the vicinage to parties tried for

crime in the tribunals of the Federal government, but this imposes no restraint upon the States in the trial of their own citizens; nor does the Constitution of this State contain any such limitation on the legislative power. Hence, the power conferred on a district judge of this State to change the venue of a felony case to another district is not violative of any constitutional right of a party charged with felony under the laws of this State.

4. SAME — PRACTICE. — A district judge, in determining as to a change of venue, whether mooted of his own motion or otherwise, exercises a discretion confided to him by the law; and unless it be clear that he has abused that discretion, his action will not be revised on appeal.

5. SAME. — The act of 1876 requires a district judge, in ordering a change of venue of his own motion, to state in his order "the grounds" therefor. This requirement is fully complied with in an order which states the grounds to be "influences from terrorism prevailing among the good people of the county" where the case is pending.

6. SAME — TERMS OF DISTRICT COURTS. — The act of May 30, 1876, "prescribing the times of holding the District Courts in the Twenty-second Judicial District," whereby five terms *per annum* are provided for the District Court of Bexar County, is a general law, and not a "special" or a "local" act within the meaning of sect. 57, art. 3, of the Constitution of 1876, which prescribes certain preliminaries and conditions to "special" or "local" legislation. It is part of the judicial organism of the State, equally affecting all within its scope, and neither special nor local in a constitutional sense.

7. GENERAL ACTS. — The term "general acts," in sect. 7, art. 5, of the Constitution, does not signify an act which shall operate uniformly throughout the entire State, but a law which may be enacted in the ordinary course of general legislation, without the forms and conditions imposed by sect. 57, art. 3, upon "local" and "special" enactments. See the opinion *in extenso* on the characteristics of "general" acts.

8. MURDER IN THE FIRST DEGREE. — The Constitution of 1869 was wholly superseded by that of 1876, which thereby thenceforth abrogated the provision of the former which empowered juries to substitute imprisonment for life in lieu of capital punishment. That provision was not a "law" within the meaning of sect. 48, art. 16, of the Constitution of 1876, which retained in force "all laws and parts of laws" not repugnant to the latter Constitution or that of the United States.

9. EVIDENCE — PRACTICE. — When portions of a witness's former statement have been adduced on cross-examination, for the purpose of contradicting or discrediting his testimony, the general rule permits the reëxamination to introduce such other portions thereof as tend to explain the meaning or motive of the former, but not to elicit new matter, even though part of the same statement and relevant to the same subject. But, *quære*, with reference to written statements, whether this rule is not enlarged by art. 751, Revised Code Criminal Procedure, which enacts that when part

of an act, declaration, conversation, or writing is introduced by one party, the other may inquire into "the whole on the same subject," or may prove other acts, etc., necessary to explain the same.

10. MURDER — DECLARATIONS AS RES GESTÆ. — Preparatory to and just before the assassination of the deceased, he was taken by a party of men in the night-time out of his father's house, but was allowed to return under surveillance and put on his boots, when, being asked by his mother who the men were, he, with exhibitions of terror, told her in a whisper who three of them were, — two of the three being defendants on trial, and the third a party jointly indicted with them. The mother's testimony of the deceased's statement to her was excluded by the court when offered by the State as original evidence; but, after the defence adduced parts of her previous deposition for the purpose of impeaching her testimony, the State was permitted, over objection by the defence, to introduce the whole of the deposition, including the statement of the deceased, though it was not directly relevant to the parts read by the defence. *Held,* that the deceased's statement to his mother was *res gestæ,* and should have been admitted as original evidence; and that its subsequent admission, whether then proper or not, was not material error.

11. SAME — AS BETWEEN CONSPIRATORS. — If two or more act together, with unlawful intent, in the perpetration of a crime, they are co-conspirators and principal offenders by reason of their common design and coöperation, and, whether they be tried and indicted jointly or separately, the antecedent acts or declarations of each, pending and in pursuance of the common design, and tending to throw light upon its execution or upon the motive or intent of its perpetrators, are competent evidence against each and all of them. Note in the opinion the collocation of authorities on this subject, and its exemplification in the evidence.

12. SAME. — But a conspirator's declaration of his individual intention to commit a crime, not made in furtherance of any design concerted with others, is not evidence against one who subsequently engaged in the conspiracy and coöperated in the commission of the offence. Note the illustrations of this principle in the present case.

13. SAME. — If several combined to commit an offence. all are amenable for whatever offence resulted from the acts of each, done in accordance with their common plan.

14. INDICTMENT — CONSTITUTIONAL LAW. — It is a mandate of the Constitution of this State that "all prosecutions shall be carried on in the name and by the authority of 'The State of Texas,' and conclude 'against the peace and dignity of the State.'" Conformity to these constitutional requirements is indispensable to the validity of every indictment.

15. SAME — CASE STATED. — The indictment in the present case concludes "against the peace and dignity of the *statute.*" No exception to it was taken in the court below, either *in limine* or by motion in arrest of judgment, and its validity was first questioned in this court by a motion for a

rehearing, after judgment of affirmance.    But *held*, nevertheless, that the defect in the indictment vitiates the conviction.

16. CONSTITUTIONAL CONSTRUCTION. — No principle of construction can empower the courts to treat as mere matter of form any express provision of the Constitution.

APPEAL from the District Court of Bexar.    Tried below before the Hon. G. H. NOONAN.

The appeal in this important, interesting, and well-contested case is from a capital conviction of each of the appellants, William Cox, Jake Ryan, and Joe Sitterlie, for the murder of George Brazell, in the county of DeWitt, on Tuesday, September 19, 1876.    The trial was had at the spring term, 1878, of the District Court of Bexar County, by reason of a change of venue awarded by Hon. H. C. Pleasants, judge of the district comprising the county of DeWitt, who, in making the order upon his own motion, assigned his reason to be his conviction " that there exists in this county influences resulting from the terrorism prevailing among the good people of the county which will prevent a trial alike fair and impartial to the accused and the State."    To this order the defendants excepted on grounds which are clearly stated in the opinion, and in which several of the rulings have their origin.

Not the fact or the character of the crime, but the identification of the appellants as participants in its perpetration, constituted the contested question at the trial in the court below.    They are but three out of seven persons charged with it by the grand jury of DeWitt County, the others being William D. Meador, Dave Augustine, James Hester, and Charles H. Heisig.    These seven were jointly charged in one indictment with the murder of George Brazell, and in another with the murder of his father, Dr. Philip Brazell, at the same time and place.    The deed was a midnight assassination, executed in the immediate presence of Theodore and Sylvanus Brazell, the youngest sons of Dr.

Brazell, and within the hearing of his wife and daughter. These two women and two boys were witnesses for the State at the trial below, and the only witnesses to what transpired at the time of the assassination.

The statement of facts comprises over two hundred pages of testimony taken down by question and answer in such manner as to render hopeless an attempt to condense it satisfactorily within practicable limits. Much of it consists of testimony adduced by the defence to establish an *alibi* for each of the three parties on trial, and of rebutting testimony for the State. Twice, however, previous to the trial in the court below, the testimony of Mrs. Brazell, her daughter, and her two surviving sons had been taken and reduced to writing in judicial investigations, and these depositions were introduced and are embodied in the statement of facts. They are in narrative form, and detail material facts more briefly and connectedly than the testimony given on the stand, and are therefore better adapted to the purposes of this report.

Mrs. M. A. Brazell, the widow of Dr. Philip Brazell and mother of George Brazell, for whose murder the appellants were on trial, stated that between ten and eleven o'clock in the night of September 19, 1876, she and her family, being all asleep, were awakened by some one making a noise and hallooing "Hello" outside the house. She got up and went to the door, and was told from the outside, and also by her husband, to make a light, which she did by lighting two lamps. Some one on the outside said, "Surround the house, boys." Theodore and Sylvanus Brazell, the youngest sons of witness, were sleeping on the gallery, and were taken out in the yard by some of the men outside, and put under guard. One man, whom the others called "Mr. Sheriff," came into the house. At first the witness thought he was Mr. Calloway, but found afterwards that he was not, and she could not say who he was. The men outside said, "Mr. Sheriff, search the house," and, speaking to the

inmates, said, "Don't be alarmed; we are after some one, but we have no idea he is here; we won't hurt a hair on your head." Some one of them shouted, "All of you come out here, you women folks; put on your clothes and come out of that house;" and they kept shouting, "Old man, get up and come out of there; come out, old man." Dr. Brazell got up and went out, and George went out without his hat, shoes, or coat, and the man called Mr. Sheriff searched the house; and then George and his two younger brothers were allowed to come into the house and put on their clothes. George was sitting in a chair, and witness asked him who it was outside. He looked around, and, there being some one sitting on the gallery, whispered to witness, "Bill Meador, Jake Ryan, and Joe Sitterlie are some of them; I know them all." He went out of the house, and the men asked him where they would get out of the yard at, and he told them to get out where they got in. Dr. Brazell spoke and said, "Here is the gate; don't tear down the fence." They asked George which was the way to Mr. Ainsworth's, and it was pointed out to them. As they went out of the yard, taking with them Dr. Brazell and his three sons in arrest, witness got up and stood at the door looking at them. She thought there were seven, eight, or ten of them, but recognized none; though she thought at the time that the man called Sheriff was Mr. Calloway, a neighbor and a deputy-sheriff, but she was afterwards satisfied it was not he. She took no particular notice of the men, knowing that her people had done nothing to be killed for. Within ten minutes after the parties left, the witness heard shooting, and went out towards them and hallooed to them not to shoot any more. She went back to the house and lay down, when some of the little children said they were afraid their father had been killed. Witness told them she reckoned not; that Mr. Calloway was their father's friend, and would not let him be hurt. The clock struck eleven just as the shooting commenced.

She did not know that her husband and her son George had been killed until about one o'clock or later, when Mr. Humphrey and Mr. Ainsworth came and told her that her son Theodore had come to Mr. Ainsworth's and reported that his father and two brothers had been killed. She then went and saw her husband's body lying near where the shooting was done, and about two hundred and fifty yards from the house. She did not see her son George's body until two or three hours afterwards; it was lying about thirty-five yards from her husband's. Both had been shot.

Mrs. Edwards, a daughter of Dr. and Mrs. Brazell, also testified for the State. She was unmarried when her testimony was taken at the examining trials, soon after the murder of her father and her brother George. Her account of what transpired at the house was in substance the same as her mother's, except that she did not hear the whispered statement made by George Brazell to his mother. She thought the party numbered as many as fifteen or twenty, and one of them she was positive and certain was Jake Ryan, one of the defendants on trial. He raised the window-sash in her room from the outside, and she went to it and told him to put it down. It was a starlight night, and she recognized him distinctly. The man who came into the house and was called Mr. Sheriff, she at first thought was Mr. Weissiger, the sheriff of the county; but her mother said he was Mr. Calloway, and witness took an opportunity to hold a light close to his face, and then saw that he was neither Weissiger nor Calloway, but a man she did not know. When her brother George came into the house after his boots, he said he was talking to Bill Meador, and Meador was then standing at the steps of the gallery. George spoke in an ordinary tone of voice, but "seemed to be scared and trembling, and he was excited." After the men left with her father and brothers in arrest, and when the shooting commenced, she was standing on the gallery and thought

she heard her brother Sylvanus scream. This caused her and her mother to run out towards the shooting, and her mother called out to the men not to shoot any more. They did not then go to the immediate spot where the shots were fired, nor learn that any one had been killed until Ainsworth came and told them. Dr. Brazell was shot through the body and one leg; George was shot between the eyes.

Sylvanus Brazell, for the State, testified that he was sleeping on the gallery the night his father and brother were murdered. He was awakened by the dogs barking, and heard some one halloo at the gate. He got up and aroused his brother Theodore. The men came into the yard and took witness and Theodore to the smoke-house, at the corner of the gallery, and said they wanted to search the house for a man named Bill Humphreys. They asked witness if any-body was in the house, and he told them his father and brother were. They called for them to come out, and they did so after awhile, and then some of the men went into the house to search. Then they took witness, his father, and brothers outside of the yard. There he recognized six of the party, of whom these appellants, Cox, Ryan, and Sitter-lie, were three, and Meador, Augustine, and Hester the others. He recognized them well, as they stood around him in a group. "There," proceeded the witness, "they told us to show them the way to Ainsworth's, and told us to go on ahead. Two of them walked along, and the others rode. We travelled that way about a hundred and fifty yards; then they told us to hold on awhile, they wanted to get their horses. They jumped on their horses and rode off, and asked which of us was the youngest one. My father told them that I was the youngest. My brother George then said, 'If you are going to kill one, kill us all;' then they said nothing. Then they commenced shooting. Bill Meador shot brother George full in the face; Dave Augus-tine shot my father. I ran off about a hundred and fifty

yards ; one of the party took after me, and asked me which one was I. I told him Sylvanus.'' Theodore ran off towards Mr. Ainsworth's. A great many shots were fired by the party. Witness was within five or six feet of the six men he recognized, and was not mistaken as to any one of them. He stated the opportunities he had previously had of knowing them. He had known Cox three or four years, and had gone to school with him. Ryan and Sitterlie he had known about a year. He stated that he had been examined as a witness at the coroner's inquest, and had then testified that he did not know any of the parties, explaining that he was at that time afraid to tell that he knew any of them, as they were not in arrest but were all living around in the country, and he was afraid they would kill him.

Theodore Brazell also testified for the State. In his deposition at the hearing on *habeas corpus* he first related the movements at and near the house in similar terms to his brother Sylvanus's account, and then gave the following narrative of what transpired after the party started off : ''After getting about two hundred and fifty yards from the house, one of them told us to stop until he could get his horse, and then the other went and got his horse. Bill Meador rode up and told the youngest one of us to go back and stay with the women at the house. The youngest is Sylvanus. Brother George told him not to let any go back to the house ; if they were going to kill us, let all be killed. He said he was not going to kill us ; he wanted us to show him the way to Ainsworth's. George then told him if he was going to kill, to kill him there ; he was not going any further ; he said if they would take him to court they could find nothing against him ; George told him he had been doing nothing. Bill Meador remarked he hadn't been doing nothing but robbing his neighbors, and then shot him. Somebody shot father ; I think it was Dave Augustine. Then I ran and Sylvanus ran ; they ran after

him, shooting at him. I ran for some distance, found no one pursued, and climbed a tree."

This witness thought there were twelve or fifteen men of the party, and recognized Meador, Augustine, Hester, and Joe Sitterlie, one of the appellants, among them. Witness ran off to Ainsworth's after the men rode off. He gave his own age as eighteen, and his brother Sylvanus's at seventeen.

Inasmuch as the opinion discloses such particular portions of the evidence as are involved in the rulings, there is no occasion to detail the testimony at greater length. What motive instigated this savage atrocity is not revealed in the record, unless it is truly indicated by the remark which, according to Theodore's testimony, Meador made to George just before shooting him. Though there is some evidence that Theodore had shot at a man named Hardin, and that a prosecution of him was contemplated, it does not appear that Meador, who was a deputy-sheriff, had any warrant for his arrest or that of any other of the Brazell family.

At the Austin term, 1879, of this court, the judgment of the court below in this cause was affirmed in an opinion which the then clerk, Mr. Feris, mislaid before it was entirely recorded, and which has never been found. The opinion now reported was rendered on a rehearing allowed upon grounds not relied upon prior to the affirmance. Owing to the want of space, very scant justice can be here done to the able and interesting arguments of the distinguished counsel who represented the appellants and the State in this court.

*Lane & Payne, Waelder & Upson*, and *J. W. Stayton*, for the appellants. The defendants, after laying the proper predicate, for the sole purpose of showing contradictory statements of, and thereby impeaching, the State's witnesses, Mrs. M. A. Brazell, Mrs. Nancy Edwards, Sylvanus and Theodore Brazell, were permitted to read certain portions of said wit-

nesses' testimony given before an examining court and on
*habeas corpus*, when said witnesses were examined relative to
the charge for which these defendants were tried in this case.
The court permitted the State to read in evidence the entire
testimony of said witnesses taken before said examining
court and on *habeas corpus*, though a great portion of the
same so read by the State was not explanatory of, or con-
nected with, nor did it tend to explain the meaning of, that
which had been read by defendants.    The State's counsel
claimed the right to read the same only as *explanatory* of
the extracts read by defendants.    Much of the testimony so
read by the State was hearsay and improper ; and upon the
examination of these witnesses in chief on this trial, under
the objections of defendants, had been ruled out by the
court.    The same, before being read by the State, was spe-
cially objected to by defendants, not only as not being ex-
planatory, but as hearsay.    Said testimony so read by the
State had a powerful and controlling influence upon the
minds of the jury.

The statements of these witnesses, read by defendants for
the purpose of impeachment, when compared with their
statements on this trial, showed contradictions of a most
material character, which could not be explained consistently
with veracity or a reliable remembrance of facts, and could
not fail to reflect most seriously upon, if not fully to
destroy, the credibility of these witnesses.

The error of the court in permitting the State to read
such testimony seems so glaring and prejudicial to the de-
fendants that the recital of authorities is wholly unneces-
sary.    We quote, however, the following, as conclusively
settling the question : —

" With regard to the examination of a witness who upon
cross-examination has been examined touching the declara-
tions formerly made by him respecting the matters upon
which he has given evidence, it cannot be carried further
than those declarations so inquired into, and the whole of

the *conve. sation which took place cannot* be entered into.
\* \* \* When once all that had constituted the motive
and inducement, and all that can show the meaning of the
words and declarations, have been laid before the court,
the court becomes possessed of all that can affect the char-
acter or credit of the witness, and all beyond this is irrele-
vant and incompetent.'' Roscoe's Cr. Ev. 184.

Mr. Greenleaf expresses the rule on the admission of this
character of evidence as follows: ''After a witness has
been cross-examined respecting a former statement made
by him, the party who called him has a right to reëxamine
him to the same matter. The counsel has a right, upon
such reëxamination, to ask all questions which may be
proper to draw forth an explanation of the sense and mean-
ing of the expressions used by the witness on cross-examina-
tion, if they be in themselves doubtful; and also the motive
by which the witness was induced to use those expressions;
*but he has no right to go further and to introduce matter*
*new in itself, and not suited to the purpose of explaining*
*either the expressions or the motives of the witness.*

'' This point, after having been much discussed in the
Queen's case, was brought before the court several years after-
wards, when the learned judges held it as settled, that proof
of a detached statement, made by a witness at a former time,
does not authorize proof, by the party calling that witness,
*of all that he said at the same time,* but only of so much
as can be in some way connected with the statement proved.
Therefore, where a witness had been cross-examined as to
what the plaintiff said in a particular conversation, it was
held that he could not be reëxamined as to the other asser-
tions made by the plaintiff in the same conversation, but
not connected with the assertions to which the cross-exam-
ination related; *although the assertions* as to which *it was*
*proposed to examine him* were connected with the subject-
matter of the suit.'' 1 Greenl. on Ev., sect. 467.

The statement made by George Brazell to his mother, M.

A. Brazell, as testified to by her on *habeas corpus* trial of these defendants, with their co-defendants in this cause, before the District Court of DeWitt County, which statement so testified to and read to the jury is as follows, to wit: " George was sitting down in a chair. I asked him who it was outside ; he looked around, and whispered to me, Bill Meador, Jake Ryan, and Joe Sitterlie are some of them. I know them all." This declaration was not made in the presence or hearing of the defendants, or either of them, or of any of the parties charged in this indictment, and, at most, was only hearsay.

The authorities draw a distinction between the declaration of the deceased before the mortal stroke, and those of the accused.

" The court also determined that the declarations of the deceased, antecedent to the stroke which occasioned the death, are not admissible evidence, and made a distinction between the declarations of the deceased and those of the prisoner." In the latter case, declarations are admissible because they tend to discover *quo animo* the act was committed. *The State* v. *Ridgely*, 2 Har. & McH. 120.

The court erred in admitting the testimony of Addison Kilgore to go to the jury, over the objection of these defendants, as to certain conversations had by said witness Kilgore with W. D. Meador, co-defendant in this cause, prior to the killing of George Brazell. These declarations of Meador were permitted to go to the jury as evidence against the appellants in this case.

They indicated a willingness and intention on his part to take the lives of Theodore Brazell, Humphreys, and the two Ainsworth boys, but it was not a declaration of intention or a threat to take the life of George Brazell ; that would be a separate and distinct offence from that of the murder of Theodore Brazell, Humphreys, or Ainsworth. Take these declarations of Meador in their broadest sense, and they do not compass the murder of George Brazell.

"Upon the trial of an indictment for forgery, evidence of the admissions on the part of the prisoner of the commission of other forgeries is inadmissible, and cannot be considered by the jury." *The People* v. *Corbin,* 56 N. Y. 363; *The People* v. *Coleman,* 55 N. Y. 82; *Peck* v. *The State,* 2 Humph. 86; *The State* v. *Stone,* 4 Humph. 27. "It is well settled that no proof of the admission of one distinct, substantive offence shall be received upon trial for that of the commission of another," — *à fortiori, shall not statements of an intention to commit it. Kinchelow* v. *The State,* 5 Humph. 12.

It was claimed by the State's counsel that the evidence was properly admitted under the proof of conspiracy. It is contended that these declarations were inadmissible until the proof on the part of the State was first made of the existence of the conspiracy, and a conspiracy that had an existence at the time the declarations were made. The acts and declarations of one defendant cannot bind another, unless they were made under a concerted plan and in furtherance of a common object. The mere declarations of the party cannot establish such concert, nor does the mere participation in the offence. "Suppose that the existence of a conspiracy may, in the first instance, be proved, without showing the participation or knowledge of the defendants; it is still a question whether the declarations of some of the persons engaged in the conspiracy may be given in evidence against others, in order to prove its existence; and, *upon principle, such evidence appears to be inadmissible.*" Roscoe's Cr. Ev. 416. "In case of conspiracy, perpetrated by several persons, when once the conspiracy or combination is established, the act or declaration of one conspirator or accomplice in the prosecution of the enterprise is considered the act of all, and is evidence against all. A foundation, however, *must first be laid by proof* sufficient, in the opinion of the court, to establish, *primâ facie,* the fact of the conspiracy between the parties, or to be laid before the

jury as tending to establish such fact." Whart. Cr. Law, 702; *The State* v. *Browning*, 30 Miss. 656; 1 Greenl. on ·Ev. 111.

Here we call to the attention of the court the eleventh assignment of error, viz.: " That the court erred in not giving to the jury a charge upon murder in the second degree."

If, as is attempted to be shown by the testimony of Kilgore, the design was to take the life of Theodore Brazell, Humphreys, and the two Ainsworth boys, is it not a reasonable inference that the killing of George and his father was by mistake, or a sudden and unpremeditated killing, — brought about suddenly,— the result of rash and uncontrollable passions, without reflection, deliberation, or cool calculation, caused by what George said and did as the whole party were on their way to Ainsworth's; and for which act of killing, however unjustifiable, only the two who actually did the killing are responsible; or, at least, that these defendants who, so far as the evidence discloses, took no part in the killing of George Brazell, and had no design of so doing, if guilty at all, could only be guilty of murder in the second degree.

If these defendants, Cox, Ryan, and Sitterlie, went to the ·house of Dr. Brazell, in company with their co-defendants, with the formed design to take the life of Theodore Brazell, and after getting to the house and while leaving the premises one of their co-defendants, without the coöperation, ·aid, encouragement, or consent of, or previously formed purpose with, these defendants, took the life of George Brazell with express malice, could these defendants be held equally guilty with their said co-defendant, or would they be guilty of any higher offence than if they had unlawfully and with express malice intended to kill one person, but in the attempt unintentionally killed another?

In the case of *Edmondson* v. *The State*, 41 Texas, 496, it was held that "it was error in the court to instruct, in substance, that they must find defendant guilty of murder

in the first degree or acquit him. Assuredly this was erroneous, if by any possible legitimate construction of the evidence the jury might have found defendant guilty of murder in the second degree."

In the case of *Sanders* v. *The State,* 41 Texas, 306, the court say : " When there may be a question whether the homicide was committed on express malice or on malice implied, it is necessary to explain these terms, and in what the difference consists, and the difference between murder in the first and murder in the second degree, as the penalty is different."

" When the judge fails to instruct the jury as to any *legitimate* deduction which they may draw from the evidence, he fails to charge the law of the case, or applicable to the case, as made by the evidence." *Lester* v. *The State,* 3 Texas Ct. App. 17. " Whenever there are facts that would influence a jury in any reasonable probability, it is the duty of the court to submit the law in charge which is pertinent to these facts." *Wasson* v. *The State,* 3 Texas Ct. App. 482.

" If in any case the facts proven create a doubt, however slight, that the case might be graded below murder, then the court should give the jury opportunity to pass upon that doubt." *Holbert* v. *The State,* 3 Texas Ct. App. 661 ; *Robles* v. *The State,* 5 Texas Ct. App. 346 ; *Taylor* v. *The State,* 3 Texas Ct. App. 387.

*John Ireland,* also for the appellants (on rehearing). Under our form of government it is not in the power of the Legislature to authorize a district judge to order, of his own motion, a change of venue to a distant county.

Under a caption like this, to wit, "An act to provide for a change of venue by the State in criminal cases" (Acts 15th Leg., p. 274), the following section (sect. 1 of said act), " That whenever, in any case of felony, the district judge presiding shall be satisfied that a trial alike impartial and fair to the accused and the State cannot, from any cause,

be had in the county in which the case is pending, he may, upon his own motion, order a change of venue to any county in his own or an adjoining district, stating in his order the grounds for such change of venue,'' is in plain and palpable violation of sect. 32, art. 33, of the Constitution.

That section reads as follows : "No bill    *    *    *    shall contain more than one subject, which shall be expressed in the title.'' I think that there will be no difference of opinion among the profession, that the *subject* here indicated in the title is a " change of venue by the *State.*'' A change of venue on the motion of the *State* is expressly provided for in the second section of the same act. It is not pretended that the venue in this case was changed under the second section. There was no representation by the district or county attorney that a fair and impartial trial could not be had in DeWitt County.

Under an act to regulate proceedings in the District Court, the Legislature could not regulate proceedings in the Supreme Court. The Constitution is imperative. *Cannon* v. *Hemphill*, 7 Texas, 208.

Under the same constitutional provision it was held that under a caption to incorporate the " San Antonio and Mexican Gulf Railroad " the Legislature could not provide for collecting a tax to pay a subscription to the road. *San Antonio* v. *Gould*, 34 Texas, 49 ; *Giddings* v. *San Antonio*, 47 Texas, 548 ; *The State* v. *Clinton*, 27 La. An. 40 ; *White* v. *Lincoln*, 5 Neb. 505. The venue is never changed by the State. *The People* v. *Vermilyea*, 7 Cow. 108.

It must be kept in mind that a change of venue was but part of the " subject,'' or " object ; " *a change of venue by the State* was the subject, or object, to be obtained, as shown by the title. How stood the common law on this subject? One of the causes of the separation by the colonies from the government of George III. was that on the 14th of October, 1774, the Congress of the Confederation "*Resolved*, the respective colonies are entitled to *the common law of Eng-*

*land*, and more *especially* to the *great* and *inestimable privilege* of being tried by their peers of the *vicinage*, according to the *course of that law*." 1 Elliott's Debates, 44. " He has combined with others to subject us to a jurisdiction *foreign* to our Constitution and unacknowledged by our law." Id. 62. This, too, while admitting that the colonies were a part of the government of Great Britain. " In criminal prosecutions, the verification of the facts in the vicinity where they happen is one of the greatest securities of life and liberty." Const. Mass., pt. 1, art. 13.

The same principle is embodied in the Federal Constitution: "And such trial shall be held in the State where such crimes shall have been committed." Story on Const., sect. 1778. " The trial is not only to be by jury, but to be held in the State where the crime was committed. The object of this clause is to secure the party accused from being dragged to a trial in some distant State [county], away from his friends and witnesses and neighborhood, and thus to be subject to the verdict of mere strangers, who may feel no common sympathy, or who may even cherish animosities or prejudices against him."

" There is little danger indeed that Congress would ever exert their power in such *an oppressive manner*." Ibid. The Fifteenth Legislature had not then been organized. " By the common law, the trial of all crimes is required to be in the county where they are committed. Nay, it originally carried its jealousy still farther, and required that the jury itself should come from the vicinage of the place where the crime was alleged to have been committed." Id., sect. 1781. " In all criminal prosecutions, the accused shall enjoy the right to a speedy public trial by jury of the State and *district* wherein the crime shall have been committed, which district [county] shall have been *previously* ascertained." Id., sect. 1782.

" The law is clear and uniform as far back as it can be traced. Where from any cause it cannot be tried *in* the

place, it shall be tried as *near* as may be." Bishop's Cr. Proc., sect. 68. The jury must be from the vicinage. Cooley's Const. Lim. 319.

When the Constitution was framed, did its authors intend, when they gave the Legislature authority to provide for a change of venue, to lay down a new rule, or did they intend to authorize a change from what it aforetime had been? I lay it down that neither this State, nor any other State of this Union, has heretofore attempted to authorize a change of venue by the government merely because it was supposed that in the *vicinage* the defendant had too many friends for the government to cope with. If it has been done, it is so recent that it has not fallen under my observation.

It is true that Mr. Bishop (Bishop's Cr. Proc., sect. 73) intimates that it might be done, and for the intimation he cites two New York cases. One of them, *The People* v. *Webb*, 1 Hill, 179, does not sustain the opinion. It was a case where the Legislature had attempted to provide for the trial of causes for offences committed on one of her streams, and was a law before the offence was committed.

The second, *The People* v. *Baker*, 3 Park. Cr., I have not access to. This intimation by that author does not bear that evidence of thought and research that he usually brings to bear on his writings.

How stands the case at bar? The offence for which appellants were prosecuted is acknowledged to have been committed before the act of the Fifteenth Legislature was passed.

Under the law as it then stood, it is not pretended that there was any authority in the judge, of his own motion, or the State, to change the venue. "No retroactive law shall be passed." Const., Bill of Rights, sect. 16. "A retroactive law is one that takes away or impairs any vested rights acquired under existing laws, or creates a new obligation, or *imposes a new duty*, or *attaches a new disability* in

respect to transactions or considerations already passed."
Sedgw. on Const. Law, 188. The power to pass such laws
has long been denied, even where there was no constitutional
inhibition. *Society* v. *Wheeler*, 2 Gall. 105. Had these ap-
pellants not a right to demand that their trial should take
place in DeWitt County, before this law was passed? *Mer-
win* v. *Railroad Co.*, 66 N. C. 398.

"The American authorities are quite uniform upon the
retroactive effect of statutes. The general rule is that no
statute, *no odds how positive* in its terms, is to be construed
as designed to interfere with existing contracts, *rights of
action, or suits,* and especially vested rights, unless the
intention that it shall so operate is *expressly* declared; and
*courts will* apply new statutes only to future cases, unless
there is something in the very nature of the case, or in the
language of the new provision, that shows that it was in-
tended to have a retroactive operation. And although the
words are broad enough in their literal extent to compre-
hend existing cases, they must yet be construed as applica-
ble to cases that may thereafter arise, unless a contrary
opinion is unequivocally expressed therein." *Wood* v.
*Oakley*, 11 Paige, 403; *Butler* v. *Palmer*, 1 Hill, 325;
*Johnson* v. *Burrell*, 2 Hill, 238; *Calkins* v. *Calkins*,
3 Barb. 306; *Warren Man. Co.* v. *Ætna Ins. Co.*, 2
Penn. C. C. 517; *Oliver Lee & Co.*, 21 N. Y. 9.

"But retrospective acts are not only inconsistent with
the idea of law as a rule of conduct, but they are, in many
instances, only the exercise of powers which are in their
nature strictly *judicial*, instead of legislative. Dwar. on
Stat. 165, and note; Smith's Comm. 291–307.

At page 305, this author says: "The people, when they
founded the government, only needed to secure rights of
property and of person. That being done, they, in making
provisions for a redress of grievances, saw fit to, and have
founded a compact, or body-politic, as the common arbiter
between them, to whose decision as to the mode of redress

they must be deemed to have tacitly yielded their assent, *subject to this* qualification only : that under a pretext of a remedy the government should not give a death-going stroke to contracts between the parties, or vested rights of property or person."

. This argument, too, where there was no constitutional inhibition against retroactive laws, as we have.

What was this but a legislative change of venue? It was that and more. It was making the judge, whose business it was to decide questions made by the respective parties, the active prosecutor. Speaking of the powers of government, art. 2 of the Constitution says that persons belonging to one class — that is, legislative, judicial, and executive — shall never exercise any of the functions of the other. "The district and county attorneys shall prosecute on behalf of the State." Const., sect. 21, art. 5. If these men had a right, before the act of the Fifteenth Legislature, to demand a trial in DeWitt County, then the Legislature could not take that right away. *Wheeler* v. *The State*, 24 Wis. 52.

*Thomas Ball*, Assistant Attorney-General, for the State. The direction that all prosecutions " shall conclude ' against the peace and dignity of the State ' " is contained in the Constitution, but is not therefore more imperative on the courts, nor entitled to greater weight, than if it was the requirement of a legislative act. Whether it is the command of the Constitution or of the statute makes no difference ; in either case it is the *law*.

But if an indictment be defective in this respect, the defendant, to avail himself of the defect, must interpose his exception or motion at the proper time. The Code of Criminal Procedure, art. 522, specifies the only pleadings available to the defendant, and among them is " an exception to an indictment or information for some matter of form or substance." Art. 528 specifies the only exceptions

to the *substance* of an indictment, and a defective conclusion is not among them.    Art. 529 specifies the exceptions to the *form* of an indictment, and shows that " any other requisite " than those made matter of substance by the preceding article (528) is a matter of form.    An exception for a defect in the substance of an indictment is good on a motion in arrest of judgment ; but art. 788 expressly enacts that " no judgment shall be arrested for want of form."    It follows that an exception for matter of form must be taken before the plea, or else the defendant is estopped therefrom in the court below, or any other court; and for the reason that when such an exception is sustained, the indictment can be amended and the trial proceed.    Art. 549.    If the defendant, after entering his plea, excepts to the form of the indictment, the exception lies in the discretion of the trial court.    *Click* v. *The State*, 3 Texas, 284 ; *The State* v. *Schwartz*, 25 Texas, 766.    And when he fails to enter such an exception previous to the plea, the verdict of the jury cures all defects of form ; and as such defects are not good in arrest of judgment in the trial court, this court cannot entertain such an exception as that now raised in the motion for a rehearing.

In *The State* v. *Schofield*, 29 Texas, 502, it was held that a general exception to an indictment — an exception which pointed out neither a defect of substance nor a defect of form — could not be considered.    If, then, a general exception before trial will not reach a defect either in the substance or the form of an indictment, it certainly follows that in the absence of any kind of exception, as in this case, the indictment cannot be questioned for any defect of form. In *Terrell* v. *The State*, 41 Texas, 463, in an opinion delivered by Chief Justice Roberts, the Supreme Court held that all defects of form must be taken advantage of before trial, and are not available in arrest of judgment.    See also *The State* v. *Williamson*, 43 Texas, 500.

It is true that the courts have no authority to dispense

with any requirement of the Constitution or any other law, when the defect is presented in the manner prescribed by law. But sect. 12, art. 5, of the Constitution of 1876, which directs the commencement and conclusion of indictments, is directory only; and it is so conceded to be by the Code of Criminal Procedure, which, in defining the substance of an indictment, excludes from the definition the commencement and the conclusion, and thereby declares them to be matters of form, and subject to the same rules of pleading as other matters of form. If, therefore, as already shown, a motion in arrest of judgment cannot reach a defect of form in an indictment, how can this court revise an indictment for such a defect, when the objection was never raised in the court below?

There are many phrases in the present Constitution which are of a legislative character, and which should therefore be treated and construed as though they were mere acts of the Legislature. A State constitution creates and defines the powers of the various departments of the State government, and places limitations thereon; all its other provisions must be legislative in their nature, and must fall under the rules of construction and pleading applicable to legislative enactments. In no way can the directory provisions of the present Constitution be harmonized with the Code of Criminal Procedure, except by applying the same rules of pleading and practice to all matters of form, whether they spring out of the provisions of the Code or out of the legislative provisions of the Constitution. The substance of an indictment is the finding of the grand jury, and is therefore not amendable; but all which is matter of form is the work of the pleader, and may be amended by direction of the court,— and if not excepted to at the proper time, is cured by verdict. *Sharp* v. *The State*, 6 Texas Ct. App. 650; *Hauck* v. *The State*, 1 Texas Ct. App. 357. The conclusion of an indictment is a matter of form. *Brown* v. *The State*, 13 Ark. 96; *The Commonwealth* v. *Kennedy*, 15 B. Mon. 531.

In this State, the question has never been brought before this court upon exception taken in the court below, and never before the Supreme Court upon such exception save in *The State* v. *Durst*, 7 Texas, 74, so far as I have been able to find. The rulings, therefore, in *Sims* v. *The State*, 43 Texas, 521, and *Holden* v. *The State*, 1 Texas Ct. App. 225, need not be considered as conclusive upon the question.

I maintain, therefore : —

1. That the conclusion of an indictment is a matter of form.

2. The conclusion being a matter of form, it is subject to the same rules of pleading and practice when directed by a constitutional provision as when prescribed by legislative enactment.

3. Defects in the form of an indictment, unless excepted to, are cured by verdict.

4. Such defects being cured by verdict, and not being cause in arrest of judgment, this court cannot reopen the matter on a motion for rehearing.

Virginia, West Virginia, and Missouri prescribe in their constitutions the same commencement and conclusion for indictments as does Texas. Yet in Missouri an indictment beginning " State of Mo." was held good, and in so holding the court looked to the statutes of the State for the rule of construction to be applied to the constitutional provision. *The State* v. *Foster*, 61 Mo. 549. See also *Lemons* v. *The People*, 5 W. Va. 755, and 18 Gratt. 989.

From the cases just cited I deduce the conclusion that an appellate court will not consider any defect in an indictment unless exception was taken to it in the court below, or unless it was fatal in arrest of the judgment. In the present case, therefore, as no exception to the conclusion of the indictment was taken in the court below, and as the defect was in a matter of form, and not cause in arrest of judgment, this court certainly will not reopen the matter on a motion for rehearing. Art. 788 of the Code of Criminal Proced-

ure, which enacts that "no judgment shall be arrested for want of form," is a legislative construction of the constitutional formula, and, in connection with arts. 528 and 529, defining substantial and formal defects in an indictment, determines the pleading and the practice by which alone the defect is available. The plea of not guilty is an admission of the validity of an indictment, and a waiver of all irregularities not previously excepted to. 52 Ala. 419 ; 27 Ohio St. 572. A defendant can waive everything in a felony case except trial by a jury. Code Cr. Proc., art. 23.

WHITE, P. J. On the night of the 19th of September, 1876, about the hour of eleven o'clock, Dr. Philip Brazell and his son George Brazell were taken from their home by a body composed of some ten or twelve armed men, claiming to be a sheriff with his *posse*, were carried some two hundred yards into the woods, and were there most foully and inhumanly shot to death. This double assassination occurred in the county of DeWitt.

Prior to the finding of an indictment, two investigations with regard to the murder were had, at each of which the testimony was reduced to writing,— the one being a coroner's inquest, and the other before a magistrate sitting as an examining court. On the 20th day of December, 1876, the grand jury of DeWitt County returned into court two indictments, the first charging seven parties, to wit, William D. Meador, Jake Ryan, Dave Augustine, James Hester, Charles H. Heissig, Joe Sitterlie, and William Cox, jointly with the murder of Dr. Philip Brazell, and the second charging the same defendants jointly with the murder of George Brazell. Defendants sued out and were brought before Judge Pleasants upon a writ of *habeas corpus*, and another investigation of the case was had, the testimony being again reduced to writing. A refusal of bail by the judge, an appeal to this court, and an affirmance of the judgment were the results of the *habeas corpus* proceed-

ings.   At the December term, 1877, of the District Court of DeWitt County, a severance having been granted, defendants Dave Augustine and James Hester came to trial on the indictment for the murder of George Brazell, and were acquitted ; and on the same day, upon motion of the district attorney, the prosecution in the same case was dismissed as to Charles H. Heissig, another defendant.   On the same day the district judge, of his own motion, changed the venue as to the other defendants to the county of Bexar.   We reproduce so much of this order as is necessary to show the pertinency of the objections urged against it on the trial.   It reads as follows, to wit : —

" *The State of Texas* v. *W. D. Meador et al.    December 29, 1877.*

"In this cause, *The State of Texas* v. *William D. Meador, Jake Ryan, Joe Sitterlie, and William Cox,* charged with the murder of George Brazell, upon motion of the judge presiding, H. Clay Pleasants, and for the reason that the judge is satisfied that there exists in this county influences resulting from the terrorism prevailing among the good people of the county which will prevent a trial alike fair and impartial to the accused and the State, it is ordered that the venue in this cause be changed from De Witt County to the county of Bexar, in the Twenty-second Judicial District of this State," etc.

To this order defendants at the time interposed the following objections, which were overruled, and the points were reserved by a bill of exceptions duly certified.

" 1.  Because there is no law authorizing the judge of the court to change the venue in said cause upon his own motion.

" 2.  Because the first section of the act of the Legislature approved August 21, 1876, is unconstitutional and void.

" 3.  Because the county of Bexar is not the nearest county to the County of DeWitt."

At the April term, 1878, of the District Court of Bexar County these appellants, Cox, Ryan, and Sitterlie, having severed from their co-defendant Meador, were all three jointly tried and each convicted of murder in the first degree. From this final judgment of conviction they prosecute their appeal to this court.

Three constitutional questions, and questions incident thereto, raised by appellants, will be disposed of *in limine*, before we examine other points during the trial. These questions are : —

1. The constitutionality of the first section of "An act to provide for the change of venue by the State in criminal cases." Acts 15th Leg., p. 274.

2. The constitutionality of "An act prescribing the times of holding the District Courts in the Twenty-second Judicial District." Acts 15th Leg., p. 11.

3. As to whether or not the eighth section of art. 5 of the Constitution of 1869, providing " that in all cases where by law it may be provided that capital punishment may be inflicted the jury shall have the right, in their discretion, to substitute imprisonment to hard labor for life," is still in force as part of the law of the land, — the Constitution of 1876 being silent upon the subject.

1. The first section of "An act to provide for the change of venue by the State, in criminal cases," is in these words : Sect. 1. " That whenever, in any case of felony, the district judge presiding shall be satisfied that a trial alike fair and impartial to the accused and to the State cannot, from any cause, be had in the county in which the case is pending, he may upon his own motion order a change of venue to any county in his own or in an adjoining district, stating in his order the grounds for such change of venue." Acts 15th Leg., p. 274.

It is contended that this section is obnoxious to the thirty-fifth section of art. 3 of the Constitution, which declares that " no bill (except general appropriation bills, which

may embrace the various subjects and accounts for and on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

The ground of objection is that the title of said act shows that the act intended only a change of venue "by the State," while this first section does not confine or limit the action of the judge to cases where it may be to the interest of, or for and on behalf of, "the State," but makes his action dependent upon the fact that he is satisfied that "a *trial* alike fair and impartial to *the accused and to the State* cannot, from any cause, be had in the county." In other words, that it does not authorize a change of venue by "the State" alone, nor in behalf of "the State" alone, but on behalf of "the accused and the State" conjointly; and that such being its purpose, the subject of the section is not expressed in the title of the act.

Should this construction be correct, it would not necessarily follow that the entire section would be void, but, as we have seen under the latter clause of the constitutional provision invoked and quoted above, the part which refers to "the accused" might be void, and still the part applicable to "the State" remain valid. But it appears to us that the criticism is hypercritical. We cannot imagine a state of case in which a trial at law in any event could be said to be fair and impartial, or *vice versa*, when it is so only as to one party, and directly the opposite as to the other. From a legal stand-point, the proposition is worse than paradoxical, — it amounts to an absurdity.

Again, it is said that the object of the act is to provide for a change of venue by "the State," and yet the first section authorizes the district judge, of his own motion, to order the change; that the judge is not the representative of the State in any judicial matter pending before him, and

that district and county attorneys are the only official representatives of the State upon whose motion or application the object of the act could be properly and legitimately obtained. True, a judge, technically speaking, may not be a representative of the State in prosecuting parties charged with crime; but he is nevertheless an officer of the State charged with the high and responsible duty of seeing that the law is faithfully administered, — that law which also enjoins that in all criminal prosecutions the accused shall have a speedy public trial by an impartial jury. Const., art. 1, sect. 10. Holding the "scales of justice equally balanced," and supposed to be far removed from the influences of interest, prejudice, and passion, he is expected to guard with equal jealousy the respective rights both of the State and the accused. Upon whom else could the power be conferred with the same confidence that it would not be abused? The authority is expressly conferred by the Constitution upon *and vested in the courts;* the manner in which it should be exercised was alone left to legislative regulation. Sect. 45 of art. 3 declares: "The power to change the venue in civil and criminal cases shall be vested *in the courts,* to be exercised in such manner as shall be provided by law, and the Legislature shall pass laws for that purpose." What is "the court" that is vested by the Constitution with power to change the venue of cases, if it is not the judge presiding? Counsel surely have overlooked this provision of the Constitution, in the able constitutional argument made against the constitutionality of the law. It is certainly not cited or referred to in the brief devoted mainly to this branch of the case.

The second section of the act, so highly commended by counsel as furnishing the only rule of practice in such cases, itself provides that the judge shall hear proof in relation to the representations of the district or county attorney, and if satisfied that the representation is well founded, and that the ends of public justice will be subserved thereby,

he shall order a change of venue, etc.    Acts 15th Leg., p. 274.    And so, under the articles of the Code providing for a change of venue on application of defendant, the judge must satisfy himself of the truth of the ground set out in the motion.    Pasc. Dig., art. 2994; *Buie* v. *The State*, 1 Texas Ct. App. 452; *Dupree* v. *The State*, 2 Texas Ct. App. 613; *Dixon* v. *The State*, 2 Texas Ct. App. 530; *Noland* v. *The State*, 3 Texas Ct. App. 598; *Johnson* v. *The State*, 4 Texas Ct. App. 268; *McCarty* v. *The State*, 4 Texas Ct. App. 461.    The correct doctrine is that the change of venue in any case depends upon whether the judge is satisfied as to its expediency or inexpediency; and his discretion determining it will not be revised unless it is clearly apparent that it has been abused.    If, then, the judge is the power that must be primarily and ultimately satisfied, why the necessity of introducing proof to satisfy him, when he is already satisfied without proof?    In other words, why prove to him a fact with regard to which, when proved, he must exercise his own discretion, when he is already sufficiently possessed of a knowledge of the fact, and prepared to act upon it on his own motion?    See 43 Ga. 483; 13 Minn. 341.

In Preston's case, where the defendant applied for change of venue, and the judge, of his own motion, ordered the case to Cooke County instead of Clay (the nearest court-house), this court said:  " If it was known to the court that the same objection existed in Clay County as in Montague, it did not require further proof of that fact, but the court would be authorized to change the venue to some county adjoining Montague, not subject to any valid objection."    4 Texas Ct. App. 186.    See *Brown* v. *The State*, 6 Texas Ct. App. 286.

This decision is conclusive of the objection.    Authority to pass such a law is unquestionably conferred by sect. 45 of art. 3 of the Constitution, *supra*, and the act of 1876 seems to us to be in perfect harmony with the Constitution.

But again, it is contended that if the act is constitutional,

the order of the judge in this instance is a nullity, because
it did not comply with the letter or spirit of the law; that
the language used in the order, — to wit, " that there exists
in this [DeWitt] county influences from terrorism prevailing
among the good people of the county which will prevent a trial
alike fair and impartial to the accused and to the State " —
is vague, uncertain, unintelligible, and meaningless.   We
do not concur in the view of counsel.   On the contrary, we
think the grounds stated by the judge are fully in compli-
ance with both the letter and the spirit of the law; are clear,
plain, intelligible, and concise; and such as, if they needed
further explanation, might well be explained by the judicial
knowledge which the court must take of the current history
of the times, wherein terrorism, as shown by this record
itself, has prevailed to such an extent in DeWitt County
that the power and authority of the law was unable to sus-
tain itself without the aid of the military arm of the State,
and the scales of justice could be kept equally balanced only
when the judicial officer holding them was supported by the
imposing presence and bearing of a determined body of
soldiery.   See the fourth section of the act of 1876, pp.
274, 275.

Another position assumed against the validity of the order
changing the venue to Bexar County is that it is in contra-
vention of the sixth article of the amendment to the Consti-
tution of the United States, which reads, that " in all crim-
inal prosecutions the accused shall enjoy a speedy and public
trial by an impartial jury of the State and district wherein
the crime shall have been committed, which district shall
have been previously ascertained by law," etc.   A sufficient
answer to this position is found in the opinion of the Su-
preme Court of the United States in the case of *Twitchell*
v. *The Commonwealth*, where it was held that the Fifth and
Sixth Amendments to the Constitution of the United States
(relating to criminal prosecutions) were not designed as
limits upon the State governments in reference to their own

citizens, but exclusively as restrictions upon Federal power. 7 Wall. 321; *Barron* v. *City of Baltimore*, 7 Pet. 243; *Fox* v. *Ohio*, 5 How. 434; *Gut* v. *The State*, 9 Wall. 35. It is to be noted that the tenth section of our Bill of Rights does not, like the Sixth Amendment, *supra*, limit the jury trial to a jury of the vicinage or of "the district wherein the crime shall have been committed;" and it is evident that, if the framers of our organic law had intended to confer the right upon offenders to have the trial so restricted, they would have said so when the matter was directly under consideration by them. That the principle is elementary, and one as old as the common-law right of trial by jury, — is uniform in other States and countries, — is no answer to an express statute declaring that in certain cases it shall be otherwise in this State. In the case of *Horbach* v. *The State*, 43 Texas, 251, Chief Justice Roberts says: "Formerly it was the rule to get jurors from the vicinage, who knew the parties and the transaction. Now the very opposite is the rule."

2. The second constitutional objection is a direct attack upon the validity of "An act prescribing the times of holding the District Courts in the Twenty-second Judicial District," approved May 30, 1876. Acts 15th Leg., p. 11. It is said if this act "be invalid, then appellants were not tried by a legal court; for that there can be no legal court unless it be held at a time and place fixed by a valid law of the State." As assumed, the positions are: 1. That the Constitution provides for but two terms annually of the District Court in each county of the State. Art. 5, sect. 1. 2. That the ordinance of the convention which framed the Constitution did fix the times and terms of the courts in the several counties in the several judicial districts. 3. That the act of May 30, 1876, provides for five terms to be held annually in the county of Bexar. No authority for the passage of the act, it is asserted, can be derived from the seventh section of art. 5 of the Constitution, which is that "the Legislature

shall have power by general act to authorize the holding of special terms [of the District Court] when necessary, and to provide for holding more than two terms of the courts in any county for the dispatch of business," etc., because, it is contended, the act is not " a general act," but " *a local law* " made expressly to operate in but one particular section of the State, composing one judicial district of the twenty-six into which the State was originally divided.

Succinctly stated, the position is that a statute of a public character cannot be enacted for a particular locality, but must have a general operation throughout the State. This identical question came up before our Supreme Court in the case of *Orr* v. *Rhine*, and in the able opinion of our present chief justice (Moore) he says: " It seems to us quite too well settled to admit of discussion, that when there is no express constitutional restriction against the passage of local laws by the Legislature, the courts cannot hold such laws void for the want of constitutional authority to enact them. * * * But it may be said, while this is undoubtedly correct as to many matters of legislation, it does not apply to the jurisdiction of courts and tribunals created either by the Constitution, or the Legislature under its authority. Of course when jurisdiction is conferred or limited by the Constitution, it cannot be diminished or enlarged by the Legislature; but when it is within legislative discretion to create other tribunals than those named in the Constitution, or to enlarge the jurisdiction of such as are named, we see no reason why the Legislature may not, with equal propriety in such cases as in other classes of legislation, exercise their discretion so as to satisfy the wants and meet the demands of the different localities and sections of the State. This has frequently been done .where the constitutional provisions were much more stringent than with us at the time this law was passed. [Citing *The State* v. *Boone*, 50 Mo. 317; *The State* v. *Ebert*, 40 Mo. 186.] * * * We can only hold a law unconstitutional which

plainly violates some constitutional provision. We cannot say that the Legislature has exceeded its authority when it can only be shown by uncertain and doubtful inferences and deductions." 45 Texas, 345 ; *Reyman* v. *Black*, 47 Texas, 558. It is true, these decisions were rendered upon statutes passed before the adoption of our present Constitution, which fact, however, does not affect the general legal principles enunciated.

Turning to the Constitution, we find enumerated in the fifty-sixth section of art. 3 the subjects upon which the Legislature is restricted from passing any local or special laws, and laws changing the times of and terms for holding courts are not mentioned amongst the subjects therein prohibited. If such laws are at all embraced in that section, it can only be under the general language of the last paragraph, where it is declared that "in all other cases where a general law can be made applicable no local or special law shall be enacted." Sect. 57 of art. 3 provides for and prescribes the rules to be observed and the forms necessary to be followed in all cases where local or special laws are desired, and their passage is expressly prohibited unless these forms are pursued. We take it that this latter section (57) relates more especially to that class of legislation which seeks the adjudication of private matters, in which the general public is not supposed to be concerned. Mr. Bouvier defines such acts to be "those which operate only upon particular persons and private concerns," whilst he defines *general or public acts* to be "those which bind the whole community." "Of these," he says, "the courts take judicial cognizance." Bouv. L. Dic., tit. "Act."

To our minds it is evident the framers of our Constitution intended by the use of the phrase "*general act*," in sect. 7 of art. 5, *supra*, not that such acts should be general to the extent that they should have a uniform operation throughout the State, but simply that in its nature, character, and passage such an act could be enacted, as any gen-

eral law might be, without going through the forms and
complying with the requisites prescribed *for local or special
laws* by the fifty-seventh. section of art. 3.    To illustrate the
idea :  As we have seen, the seventh section of art. 5 expressly.
says " the Legislature shall have power, *by a general act*, to
authorize the holding of *special* terms of the District Court
*   *   *   in any county for the dispatch of business."    *A
special term* for such purpose in but one county could not, in
the nature of things, have a uniform operation throughout the
State ;  and it would be an absurdity to hold that it was
necessary in such a case, or could ever have been intended,
that the *general act* by which such a purpose or object
might be accomplished should include and embrace within
the range and scope of its provisions the one hundred and
fifty or two hundred other counties in the State that could
have no possible interest in the subject-matter.    Techni-
cally speaking, an act to hold a special term in a particular
county would appear to be both a special and a local law.
Doubtless the intention was that in the passage of such an
act the same forms were to be observed as in any other
ordinary *general act* as contradistinguished from those
essential to the validity of *local or special laws*.    Any other
construction, it seems to us, would make the expression
*" general act "* not only contradictory of the provision, but
unintelligible in its meaning.    *The People* v. *Davis*, 61
Barb. 456.

The whole difficulty of the subject is occasioned by the
trouble of arriving at a proper definition of a " *general law*."
We think the rule laid down by the Supreme Court of Cali-
fornia in *Brooker* v. *Hyde* gives us a proper and satisfac-
tory solution of the difficulty.    In that case it is said, a
" *general law* is one whose operation is equal in its effect
upon all persons or things upon which the law is designed
to operate at all.    All laws operate upon persons or things.
Are we, then, to understand that a *general law* is only one
which operates upon all persons or upon all things?    If so,

it is obvious that our *general laws* are very few, if indeed there are any of that class. Obviously, such cannot be the meaning of the words " of a general nature " as here used. The word ' *general* ' comes from ' *genus*,' and relates to a whole *genus* or kind ; or, in other words, to a whole class or order. Hence a law which affects a class of persons or things, less than all, may be a general law." 37 Cal. 366.

The act prescribing the times of holding the District Courts in the Twenty-second Judicial District, and providing for five annual terms in Bexar County, was intended to form part of the general machinery to be used in the admin- istration of the laws of the State, affecting equally the whole citizens of the State who came within its range ; and being such, it cannot be considered either *special or local* in the view contemplated by the Constitution. *Conner* v. *Mayor of New York*, 1 Seld. 296 ; 2 Sandf. 361 ; *Bohl* v. *The State*, 3 Texas Ct. App. 685. Even if the seventh section of art. 5 should be held in conflict with the fifty-seventh section of the third article, the former would govern, as it specially regulates the subject-matter, and is equally with the other the behest of supreme authority. *Warren* v. *Shuman*, 5 Texas, 441.

3. A last constitutional question raised and insisted upon by appellants is that the latter clause of sect. 8, art. 5, of the Constitution of 1869 was not abrogated by the Consti- tution of 1876, but that it still remains in full force and vigor as part of the criminal law of the State, and that as such the court should have given it in charge to the jury as part of the law applicable to the case. The clause or pro- viso is as follows, viz. :  " That in all cases where by law it may be provided that capital punishment may be inflicted, the jury shall have the right, in their discretion, to substi- tute imprisonment for life." Our present Constitution (1876) does not contain this or any similar provision, but is entirely silent upon the subject ; unless, indeed, as is urgently contended for appellants, it is embraced in and

comprehended by sect. 48, art. 16, as follows: "All laws and parts of laws now in force in the State of Texas, which are not repugnant to the Constitution of the United States or to this Constitution, shall continue and remain in force as laws of this State until they expire by their own limitation or shall be amended or repealed by the Legislature." It is urged that this commutation of punishment was a law and became practically a part of the Criminal Code; that it has not been expressly repealed by the adoption of the new Constitution or by any subsequent legislative enactment.

In the case of *Murray* v. *The State*, 1 Texas Ct. App. 417, this court held that, " though the Constitution of 1876 contains no similar provision to that above referred to, yet it cannot be held to have abrogated that provision with respect to capital felonies perpetrated while the Constitution of 1869 was in force, inasmuch as such a construction would make the Constitution of 1876 obnoxious to the prohibition in the Constitution of the United States with reference to *ex post facto* enactments by the States." As thus enunciated, we still think the doctrine sound both in reason and law. But here the case is different. As now presented, the question is whether or not, in supplanting and superseding entirely the Constitution of 1869, the one of 1876, professing as it does to be complete and perfect in itself, still left in force any portion of the former. We think not. The very purpose of the Constitution of 1876 was to do away effectually and for all time with every part and parcel of the Constitution of 1869, except such as was by positive language retained and incorporated into the former instrument. The ordinance providing for its adoption declared that, if adopted, it should on the third Tuesday in April, 1876, become and thereafter be the organic and fundamental law of the State. In so becoming, the former Constitution became *ipso facto* dead so far as any continuing or prospective operation was concerned, and only retained

vitality to the extent that vested rights were dependent upon the further observance of any of its provisions.

There is a marked distinction between " laws " and " constitutional provisions." In ordinary use of language, it will hardly be contended that such "provisions" constitute laws. Laws of a State are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws. " Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves and for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." " That meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither courts nor legislatures have a right to add to or take away from that meaning." Cooley's Const. Lim. 57–59 ; Story on Const., sect. 451.

Having adopted a Constitution which fails to declare that imprisonment for life shall be an alternative punishment for murder in the first degree, it is but fair to presume that the makers of that instrument, and the people who adopted it, intended to nullify that provision of the Constitution of 1869, and to limit the punishment to death as fixed by the statute,

Having disposed of the constitutional questions, we now turn to the consideration of the other supposed errors committed during the progress and conduct of the trial. All such, as far as they have been relied upon in the able oral arguments and briefs of appellants' counsel, are summed up in the assignment of errors which is made part of the transcript of the record. Some of these supposed errors have already been disposed of. Without confining our-

selves to a discussion *seriatim* of the remaining questions,. we will endeavor, nevertheless, to embrace all such as are deemed important in our further investigation of the case.

1. On the trial, for the purpose of impeaching the State's witnesses by showing that they had made contradictory statements, the defence read in evidence portions of the written testimony of these same witnesses as deposed to at the two former hearings of the case ; that is, on the trial had before the examining court, and at the trial on *habeas corpus* before the district judge. Numerous extracts were thus read, selected to suit the purposes of defendants, from the different portions of these written statements. To meet these supposed contradictions, the prosecution, by permission of the court, and over objections of defendants, read the entire evidence as taken down in writing at the two trials. This, it is contended, was erroneous in two respects : *first*, because it was violative of the known rules of evidence ; and *secondly*, because by reading the entire testimony the State was enabled to put before the jury new matter, a portion of which had heretofore been ruled out by the court as illegal and inadmissible when offered as original evidence.

With regard to the above proposition, counsel quote as authority the familiar and well-established rules enunciated by Mr. Roscoe and Mr. Greenleaf. Roscoe says : "With regard to the examination of a witness who upon cross-examination has been examined touching the declarations formerly made by him respecting the matters upon which he has given evidence, it cannot be carried further than those declarations so inquired into, and the whole of the conversation which took place cannot be entered into.   *   *   * When once all that had constituted the motive and inducement, and all that can show the meaning of the words and declarations, have been laid before the court, the court becomes possessed of all that can affect the character or credit of the witness, and all beyond is irrelevant and incompetent." Roscoe's Cr. Ev. 184.

As expressed by Greenleaf, the rule is: "After a witness has been cross-examined respecting a former statement made by him, the party who called him has a right to re-examine him to the same matter. The counsel has a right, upon such re-examination, to ask all questions which may be proper to draw forth an explanation of the sense and meaning of the expressions used by the witness on cross-examination, if they be in themselves doubtful; and also of the motive by which the witness was induced to use those expressions; but he has no right to go further and to introduce matter new in itself, and not suited to the purpose of explaining either the expressions or the motives of the witness. * * * Therefore, where a witness had been cross-examined as to what the plaintiff said in a particular conversation, it was held that he could not be re-examined as to the other assertions, made by the plaintiff in the same conversation, but not connected with the assertions to which the cross-examination related; although the assertions as to which it was proposed to re-examine him were connected with the subject-matter of the suit." 1 Greenl. on Ev., sect. 467.

As stated in these quotations, the doctrine will not be controverted or denied. It is to be noted, however, that the rules here laid down have reference directly to oral or verbal examinations and cross-examinations of the witnesses. Whether a different rule should obtain where the declarations are taken from written statements, and whether these written statements would not come within the purview of our statute (and in our opinion they do) which declares that "when part of an act, declaration or conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation, or writing is given in evidence, any other act, declaration, or writing which is necessary to

make it fully understood, or to explain the same, may also be given in evidence" (Pasc. Dig., art. 3129) — we say, whether it be held the one way or the other does not affect the question. In our opinion, the admission of the entire evidence did not in the main go beyond the legitimate scope of the rules with regard to oral or verbal statements as above quoted, and so earnestly invoked by counsel for defendants; because the portions read by them as involving the supposed contradictions were so numerous, and comprehended so many and different aspects of the facts deposed to by the witnesses, that indeed it is almost impracticable, if not impossible, to separate the remaining portions so as to say that any of them were not necessary to an understanding, and directly explanatory of these supposed contradictory statements. *Weir* v. *McGee*, 25 Texas (Supp.), 21; *Smith* v. *Chenault*, 48 Texas, 455.

But it may be said that while this is true in the main, it will not hold good with reference to the second proposition, — that all rules were transcended in the introduction and admission of new matter in the written evidence which had been excluded when offered in the original evidence, and about which defendants had made no inquiries, and had read nothing from the written evidence in their efforts at impeachment. To make this objection clear of comprehension, we will state the facts as they appear of record. In her evidence taken on the examining and also on the *habeas corpus* trials, Mrs. M. A. Brazell had testified in substance that her son George Brazell, the murdered man, after he had been arrested and taken from the house, was permitted to return that he might put on his boots. She says: " George was sitting down in a chair. I asked him who it was outside; he looked around and whispered to me, ' Bill Meador, Jake Ryan, and Joe Sitterlie are some of them; I know them all.' " When Mrs. Brazell was upon the witness-stand, the prosecution proposed to prove these declarations of the deceased by her, and on ob-

jection of the defendants that the testimony was hear-say, not having been made in the presence or hearing of defendants or either of them, the court refused to admit the evidence.

In our opinion, this testimony was legitimate as original evidence, and the court erred in its exclusion. It may be further necessary that we should state in this connection that the evidence discloses that George, his father, and two brothers had all been arrested at the dead hour of night by a band of armed men, who had previously surrounded the house; that they had been ordered out of the house before they had time to clothe themselves; that George was per-mitted to return into the house to get his boots; that he was still in the custody and under the surveillance of his captors. His sister, Mrs. Edwards, says: "He came back after his boots; then I heard him say he was talking to Bill Meador. Then Bill Meador was standing at the steps of the gallery. * * * He (George) spoke in an ordinary tone of voice; he seemed to be scared and trembling, and he was ex-cited."

We have maturely considered the matter, and can per-ceive no good reason why, under the rules as they seem now to be well settled and established, these declarations were not good as original evidence and parts of the *res gestæ*. Here the party declarant was suffering from mental excite-ment; he was scared, and well he might be; he was in duress, — he was forcibly and illegally imprisoned. He was pale and trembling, showing that he but too fully real-ized his fearful situation, and but too truly anticipated its immediate and awful consequences. Under such mental emotions, feelings, and sufferings, he tells in the very mo-ment of his agony and his fear who they are who are the occasion of it, — tells it to his mother, the dearest, the staunchest, the most confidential friend of his life, — whis-pers to her, conscious that perhaps it is the last communica-tion he would ever be permitted to make her upon earth,

that "Bill Meador, Jake Ryan, and Joe Sitterlie are some of them; I know them all."

Mr. Greenleaf says: "Wherever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings, made at the time in question, are also original evidence." 1 Greenl. on Ev., sect. 102. In the well-considered case of *Insurance Company* v. *Moseley*, and which is now the leading case upon this subject, the Supreme Court of the United States held "that the declarations of a party himself, to whomsoever made, are competent evidence when confined strictly to such complaints, expressions, and exclamations as furnish evidence of *a present* existing pain or malady, to prove his condition, ills, pains, and symptoms, whether arising from sickness or from injury by accident or violence. So is a declaration made by a deceased person, contemporaneously or nearly so with the main event by whose consequences it is alleged that he died, as to the cause of that event.   *   *   *   Where the principal fact is the fact of bodily injury, the *res gestæ* are the statements of the cause made by the injured party almost contemporaneously with the occurrence of the injury, and those relating to the consequences, made whilst the latter subsisted and were in progress." 8 Wall. 397 (citing *Bacon* v. *The Inhabitants*, 7 Cush. 585; *Thompson and Wife* v. *Trevrian*, Skin. 402; *Aveson* v. *Kinnard*, 6 East, 197; *King* v. *Foster*, 6 Car. & P. 325; *The Commonwealth* v. *Pike*, 3 Cush. 181; *Beaver* v. *Taylor*, 1 Wall. 637). The dissenting opinion of Clifford, J., which was concurred in by Judge Nelson, in that case, does not controvert the rule, nor its application in the view and to the extent we apply it to the fact here presented. The same doctrine is, in effect, declared in 33 Mich. 49, and *Rogers* v. *Crain*, 30 Texas, 284. If a party's declarations at the time as to the cause of his physical sufferings are admissible evidence, why not his declarations of his present mental emotions and feelings, and who it is that has caused

these feelings, by having already illegally deprived him of his liberty, and who are in an active state of preparation to deprive him, in a few short moments, of his life?

If, then, the evidence was competent and legitimate, should the bare fact that it was admitted incidentally, and out of time and place, destroy its legitimacy, and render also incompetent and inadmissible other legitimate evidence with which it happened to be blended? We cannot think so. It was not only competent evidence *per se*, but was, moreover, intimately connected with the subject-matter of some of the attempted contradictions of the witnesses, — especially in the matter of the identification of the accused parties, — and was, further, calculated to throw light upon it. As was said in *Carroll* v. *The Commonwealth*, 84 Pa. St. 107: "We must look at the real competency of the evidence, and not at the order of its reception; and when we find that it was all finally competent, we will not reverse because of the time or order of its introduction." Had the evidence been illegal and improper, of course its admission would have necessitated a reversal of the judgment. *Draper* v. *The State*, 22 Texas, 400; *Mc Williams* v. *The State*, 44 Texas, 116; *Preston* v. *The State*, 4 Texas Ct. App. 186.

2. Another most radical error, it is contended, was committed by the court in allowing the witness Kilgore, over objections of defendants, to give evidence of certain conversations which took place prior to the killing of George Brazell, between witness and W. D. Meador, who, though jointly indicted with them for the murder, was not on trial, and which conversations were not had in the presence and hearing of defendants. The grounds of objection to this testimony may be stated thus: —

1. No conspiracy between Meador and these defendants had been previously established, or shown to exist, and therefore his acts and declarations were not binding upon them.

2. That the declarations of Meador simply showed a willingness and intention on his part to do certain acts, without showing that there was any present agreement and conspiracy between himself and these defendants, or any other persons, to do the acts spoken of.

3. That the plot or conspiracy, if any such was developed by Meador in these conversations, was a plot or conspiracy to murder different persons, and at a different time from the murder for which defendants and their co-defendant Meador were indicted in this case.

4. That the plot or conspiracy, so called, as developed by Meador, had never been executed.

A brief statement of the facts bearing upon this issue will illustrate its force and character. Meador was deputy-sheriff of DeWitt County, and as such officer had in his hands for execution a writ for the arrest of Theodore Brazell and one William Humphreys. On the Friday evening before the Tuesday upon which the murder was committed, Meador summoned the witness Kilgore and others as a *posse*, to go with and assist him in arresting these parties. William Cox and Augustine, two of the parties also subsequently indicted for the murder, were of the *posse*. After Cox and Augustine got with the party, they all started to the house of Hardin, the man at whose instance the writ of arrest had issued because Brazell and Humphreys had threatened his life. Two separate and distinct conversations occurred between Meador and the witness, which are detailed by him, — the first as they were riding over from William Cox's to Hardin's, and before they reached Hardin's. Testifying on his direct examination as to this conversation, the witness says: "We [he and Meador] were riding together. He said he was willing or going to kill them if he could get any one to go with him. He was talking about Theodore Brazell, young Humphreys, and one or two of Ainsworth's boys. * * * He said he was willing to kill these parties. * * * If he could get somebody to go with him,

he would go out to Shiloh Church some night when church was there, and each man that would go with him was to single out his man, and march them off from church and burst him open.  That is what he said.  This was said as we went to Hardin's."  Witness did not know whether defendant Cox, who was riding close by, heard this conversation or not.

Arrived at Hardin's house, they remained some time, during which Meador, Hardin, and Augustine went behind the house and had a conversation amongst themselves.  When they came back, they told the witness Kilgore they were not going to do anything, and Meador said he would not make the arrest, because Hardin would not testify against the parties.  Shortly after this, the deputy-sheriff, Meador, and his *posse* started on their return to the house of Augustine. It was on the return trip that the second conversation occurred between Meador and the witness.  Witness says: " Going back to Mr. Augustine's, Meador told me that they were going to kill the parties,— Humphreys, Theodore Brazell, and the two Ainsworth boys.  He told me they were going on Monday night to do it.  He told me this Friday evening.  He told me the next Monday they were going to do the killing."  To the question " What was the expression of Meador?"  witness replied,  " He said ' We are going to kill them.'  He said ' We are going to do it.'  He did not say who was going with him.  Meador told me that Augustine was going with him.  He told me he was right in for it."  Witness is satisfied that Cox did not hear this conversation.  In another portion of his testimony the witness says that Meador told him that Cox was going with him to do the killing.  This is in substance a *résumé* of the principal points in the evidence objected to.

Now, the first objection is that since a conspiracy *ipso facto* had not been established, this testimony was inadmissible.  Mr. Phillips says : " It is an established rule that when several persons are proved to have combined together

for the same illegal purpose, any act done by one of the party in pursuance of the original concerted plan with reference to the common object is, in contemplation of law, the act of the whole party." Ph. on Ev. (5th ed.) 168. And proof of the plot or combination must precede proof of declarations made by either of the conspirators, though the acts and declarations of separate parties in the planning or execution of the scheme may be shown in evidence of the common design. *The State* v. *Simons*, 4 Strobh. 266 ; *Regina* v. *Mear*, 1 Eng. Law & Eq. 581 ; *The State* v. *Ripley*, 31 Me. 386 ; *Glory* v. *The State*, 13 Ark. 236 ; *Hardin* v. *The State*, 4 Texas Ct. App. 366.

The correct rule is also stated by Mr. Greenleaf. He says : " The same principles apply to the acts and declarations of one of a party of conspirators in regard to the common design as affecting his fellows. Here a foundation must first be laid by proof sufficient, in the opinion of the judge, to establish *primâ facie* the fact of conspiracy between the parties, or proper to be laid before the jury as tending to establish such fact. The connection of the individuals in the unlawful enterprise being thus shown, every act and declaration of each member of the confederacy in pursuance of the original concerted plan and with reference to the common object is, in contemplation of. law, the act and declaration of them all, and is therefore original evidence against each of them. It makes no difference at what time any one entered into the conspiracy. Every one who does enter into a common purpose or design is generally deemed in law a party to every act which has before been done by the others, and to every act which may afterwards be done by any of the others, in furtherance of such common design. Sometimes, for the sake of convenience, the acts and declarations of one are admitted in evidence before sufficient proof is given of the conspiracy, the prosecutor undertaking to furnish such proof in a subsequent stage of the cause. But this rests in the discretion of the judge,

and is not permitted except under particular and urgent circumstances, lest the jury should be misled to infer the fact itself of the conspiracy from the declarations of strangers. And here, also, care must be taken that the acts and declarations thus admitted be those only which were made and done during the pendency of the criminal enterprise and in furtherance of its objects. If they took place at a subsequent period, and are therefore narrative of past occurrences, they are, as we have just seen, to be rejected." 1 Greenl. on Ev., sect. 111.

Mr. Roscoe says: "After the existence of a conspiracy is established, and the particular defendants have been proved to have been parties to it, the acts of the conspirators may in all cases be given in evidence against them." Roscoe's Cr. Ev. 387. Many recent decisions have gone further, perhaps, in laying down rules and in discussing the law of conspiracy, and we do not deem it inappropriate in this connection to call attention to some of these cases as illustrative of and shedding much additional light upon the subject.

In *The People* v. *Brotherton*, 47 Cal. 388, it was held: "Where two are jointly indicted, the prosecution may on the trial prove the declarations and acts of one done in the absence of the other, before proving the conspiracy between the defendants, provided proof of such conspiracy is afterwards made."

In *The State* v. *Winner*, 17 Kan. 298, it was held that " ordinarily, when the acts and declarations of one co-conspirator are offered in evidence against another co-conspirator, the conspiracy itself should first be established *primâ facie*, and to the satisfaction of the judge of the court trying the cause ; but this cannot always be required. It cannot well be required where the proof depends upon a vast amount of circumstantial evidence, — a vast number of isolated and independent facts. And in any case where such acts and declarations are introduced in evidence, and

the whole of the evidence introduced on the trial, taken together, shows that such a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations.''

In *The People* v. *Geiger*, 49 Cal. 643, it was held that '' if two are jointly indicted for murder, and are tried separately, and on the trial of one there is testimony tending to show a conspiracy between them, the declarations of the one not on trial, made before the killing, may be received in evidence. And the conspiracy to commit a crime being proved on the separate trial of one of the conspirators, the jury are to give the same weight to the declarations of the co-conspirator not on trial as they would give them if made by the one on trial.'' See also *The People* v. *Cotta*, 49 Cal. 166.

Now, when we turn to our statutes, we find that they declare that '' all persons are principals who are guilty of acting together in the commission of an offence ; '' and that, '' where an offence is actually committed by one or more persons, but others are present, and, knowing the unlawful intent, aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act; or who, not being present, keep watch so as to prevent the interruption of those engaged in committing the offence, such persons so aiding, encouraging, or keeping watch are principal offenders, and may be prosecuted and convicted as such.'' Pasc. Dig., arts. 1809, 1810. To our minds, a great deal of the trouble, confusion, and discussion with regard to conspiracy, where two or more are charged with the commission of crime, might and can be obviated by keeping in mind these statutory provisions. If the parties can be identified at the time and place as joint participants in the commission of the crime, why the necessity of going behind that fact to establish a conspiracy to do the act already accomplished, and for which the law denounces them as prin-

cipal offenders and liable to punishment as such? Why want a better predicate, or any further evidence even of a conspiracy, if their presence and guilty participation is already established? To us it seems too plain to admit of argument, that, when two or more are found acting together with an unlawful intent in the commission of an offence, the common design and acting together makes them *ipso facto* conspirators,— endows them as a body with the attribute of individuality, — merges the conspiracy to do the act in the act itself; and that the previous acts and declarations of each or any such principal offenders in pursuance of the agreed plan, and tending to throw light upon it or the motive or intent with which it was committed, is and should be received as legal and admissible evidence against each and all, whether indicted, prosecuted, and tried jointly or separately. 1 Bishop's Cr. Law, sect. 432; *Kelley* v. *The People*, 55 N. Y. 566; 2 Whart. on Ev. 1205; 47 Ind. 568. This rule in nowise conflicts with the doctrine enunciated in *Burrell* v. *The State*, 18 Texas, 713; *Draper* v. *The State*, 22 Texas, 400; *Wright* v. *The State*, 43 Texas, 170, or *Preston* v. *The State*, 4 Texas Ct. App. 186, because the ruling in each of those cases excluding the declarations was based upon the ground that there were no such proofs of complicity as would warrant the declarations of the one party against the other.

But it is said that the declarations of Meador simply showed a willingness or intention on his part to do certain things, without showing that any one else had agreed to act with him at that time. This objection is only applicable to the expressions used by Meador in the first conversation with Kilgore, on the way from Cox's to Hardin's. Upon mature reflection, we are of opinion that this testimony was not admissible under any rule of evidence, but was directly in conflict with all the known and recognized rules. The general rule is that " the evidence of what was said and done by the other conspirators must be limited to their acts and

declarations made and done while the conspiracy was pend-
ing, and in furtherance of the design, — what was said by
them *before or afterwards* not being within the principles of
admissibility." 1 Greenl. on Ev. 894.

A case directly in point is *Fouts* v. *The State*, 7 Ohio,
471, where it was held that "the declarations and admis-
sions of a party made in his own behalf and detailing what
he personally intends to do, but not in furtherance of any
concerted action with others, are not admissible in evidence
against an associate in crime, although he and each associate
may afterwards engage in and be indicted for the same
criminal act to which the declarations and admissions related,
and although it may also be proved that before making the
declarations the two had jointly arranged to commit the
identical act." We believe that the first proposition con-
tained in the extract quoted is sound in reason and law; but
we do not concur in the latter. For, in our opinion, if it be
proven that before making the declarations the conspiracy
to do the act had been agreed upon and entered into, such
declarations would be both legal and admissible. A similar
question arose in *The People* v. *Gorham*, and the testimony
was held illegal; the court saying, "It was a mere state-
ment of his own intention to commit a crime with Bow-
dish," — Bowdish not being present, and no conspiracy
having been proven to exist at the time. 23 N. Y. 93.

The admission of this testimony would of itself alone
require a reversal of the case, for the settled rule is that
"the admission of illegal evidence of an important fact,
material and pertinent to the issue, and which is additional
to other facts legally in evidence, is erroneous, and a con-
viction will not be permitted to stand, however certain it
may be that the jury would have found a verdict of guilty
upon other sufficient evidence adduced on the trial." *Mc-
Williams* v. *The State*, 43 Texas, 116.

With regard to the two other objections to the testimony
of Kilgore as to his conversation with Meador, which we

have pointed out above, we deem it only necessary to say that, as urged, the objections are not tenable. "If two or more combine to do an unlawful thing, and the act of one, proceeding according to the common plan, terminates in a criminal result, though not the particular result intended, all are liable." 1 Bishop's Cr. Law (4th ed.), sect. 435; *Hannah* v. *The People*, 86 Ill. 243; *Brennan* v. *The People*, 15 Ill. 511; *Williams* v. *The State*, 47 Ind. 568; *Gassenheimer* v. *The State*, 52 Ala. 314.

The last question which we propose to notice is one raised for the first time since this case was pending in this court upon appeal, and only raised here for the first time on the motion for a rehearing. This question goes to the sufficiency and validity of the indictment.

It is a provision of our Constitution that "all prosecutions shall be carried on in the name and by the authority of 'The State of Texas,' and conclude 'against the peace and dignity of the State.'" Const., art. 5, sect. 12. Our statute also prescribes the requisites to an indictment, the first of which is "That it shall commence 'in the name and by the authority of the State of Texas,'" and the eighth, "The indictment must conclude 'against the peace and dignity of the State.'" Pasc. Dig., art. 2863; Rev. Code Cr. Proc., art. 420. The indictment in this case, both in the copy set out in the transcript, and in the original which we have had before us for inspection, concludes "against the peace and dignity of the *statute*," instead of "against the peace and dignity of the State."

It has been ably argued by the assistant attorney-general that these words are mere words of form, — are not a part of the substance of the indictment, — were not a matter material to be found by, and not a part of the finding of, the grand jury, but were solely a matter of pleading; that, in order to avail of such defect, an exception to the indictment should have been taken in the court below, and, not having been taken either by exception or motion in arrest, that

the verdict has cured the informality, and it cannot be in-
quired into or taken advantage of for the first time on
appeal. We confess the question has been one of no little
embarrassment, and in our research we have spared no pains
in hunting up and collecting all the authorities where the
subject has been discussed and adjudicated in the courts
of this country. The difficulty in obtaining the authorities,
for some of which we have had to send outside the State,
has occasioned the delay in the decision of the case. We
believe that we have at length consulted every case in the
United States wherein the question has been reviewed, so
far as the authorities were accessible.

Our conclusion is that the previous decisions of the courts
of this State, which decisions have been controverted in their
applicability to the *status* of this case, are authority in
point, and they, according to the view we take of the sub-
ject, are abundantly sustained by the great weight of au-
thority which we propose to cite from other sources, and which
establishes the proposition that, whilst the constitutional re-
quirement is, critically speaking, matter of form, it is also
nevertheless matter of substance by virtue of the fact that
it is part of the Constitution, no declaratory portion of
which are the courts empowered with authority to declare
only formal when the language is positive and unambiguous.
However much we may feel disposed to consider a matter
prescribed by the Constitution ill-advised or useless, — how-
ever much we may be inclined to doubt the propriety of
inserting into the organic, fundamental law of the State
requisites of forms with regard to procedure and practice in
the courts, — the answer is, the people themselves, the
source of all power and authority in a republican govern-
ment, have spoken it; and with regard to their *ipse dixit*,
when contained in the Constitution, which is but the expres-
sion of their sovereign will, the courts can only bow in
humble obedience, and say " *ita est scripta.*" If plain and
unambiguous, no ordinary rules of construction are appli-

cable to these expressions; their inherent, binding authority is superior to all ordinary rules. As was said by Mr. Justice Emmet, and concurred in by Judge Cooley: "It will be found, upon full consideration, to be difficult to treat any constitutional provision as merely directory and not imperative." *The People* v. *Lawrence*, 36 Barb. 186; Cooley's Const. Lim. (3d ed.) 82.

In *The State* v. *Durst*, 7 Texas, 74, the court say: "It will suffice, for the disposition of this case, to observe that it is a positive requirement of the Constitution that the indictment conclude 'against the peace and dignity of the State.' Hart. Dig. 62, sect. 9. It is scarcely necessary to say that the courts have no authority to dispense with that which the Constitution requires."

In *The State* v. *Sims*, Chief Justice Roberts says: "The indictment omitted the conclusion required by the Constitution: 'against the peace and dignity of the State.' It was excepted to, and set aside by the court; but not on that ground. That is not one of the exceptions to matters of substance specified in the Code of Criminal Procedure. In the case of *Durst* v. *The State*, it is said 'the courts have no authority to dispense with that which the Constitution requires,' in sustaining an exception of this kind made to an indictment. 7 Texas, 74. It has been held to be a fatal defect, whether specially excepted to or not. *The State* v. *Lopez*, 19 Mo. 254; *The State* v. *Pemberton*, 30 Mo. 376. It is an objection so obvious that if we were in doubt about sustaining it under our Code, it would be useless to send it back to be made in the court below." 43 Texas, 521. In *Holden* v. *The State*, 1 Texas Ct. App. 225, it was held that an indictment which did not conclude "against the peace and dignity of the State" was fatally defective.

In *Rice* v. *The State*, 4 Heisk. 215, it was held that "an indictment that does not conclude 'against the peace and dignity of the State' is a nullity. It is a positive injunction of the Constitution itself that such shall be the conclusion

of every indictment. It is therefore a matter that cannot be affected by legislation, and a defect that cannot be ignored by the courts. An indictment without these words is not an accusation of crime, and not an indictment in the sense of the Constitution. No conviction upon such an indictment could be permitted to stand, and a prisoner cannot waive his rights in this respect, as it is the imperative mandate of the Constitution that all crimes shall be prosecuted by presentment or indictment, and that all indictments shall conclude ' against the peace and dignity of the State.' " " The conclusion ' against the peace and dignity of the State' cannot be dispensed with." 1 Green's Cr. Rep. 266. The same doctrine is emphatically declared in *Thompson* v. *The Commonwealth*, 20 Gratt. 724, and *Carney's Case*, 4 Gratt. 546.

In *Nicholas* v. *The State*, 35 Wis. 308, the court say: " The Constitution (art. 7, sect. 7) provides that ' all indictments shall conclude against the peace and dignity of the State.' This formula is a mere rhetorical flourish, adding nothing to the substance of the indictment, and it is difficult to see why the mandate for its use was inserted in the Constitution. Yet it is there, and must be obeyed. We enforced obedience to it in *Williams* v. *The State*, 27 Wis. 402. Of course the accused cannot be possibly prejudiced or in any manner misled by the omission of the formula from an indictment, and the use of it is held necessary for the sole reason that the Constitution ordains that it shall be used."

But a case directly in point, and meeting the positions taken by the assistant attorney-general in this case, is *Lemons* v. *The People*, 5 W. Va. 755, where it was held — the indictment concluding " against the peace and dignity of the State of W. Virginia " — that the indictment was not sufficient. Further, as stated concisely in the syllabus, " When the Constitution of the State requires an indictment to conclude in certain form and words, the indictment

is not good unless it concludes in the exact language of the Constitution.    And a prisoner failing to demur, or moving to quash, or moving in arrest of judgment, on an indictment not in the exact language of the Constitution, cannot be held to have waived his right to make objection to the indictment in the appellate court, the right being a constitutional and not a personal right."

In other States, it has been held that the exact words are not necessary if words in substance and of like import are used.    *Anderson* v. *The State*, 5 Ark. 444 ; *Rogers* v. *The Commonwealth*, 5 Serg. & R. 462 ; *Yancey* v. *The State*, 1 Const. (So. Car.) 237 ; *The Commonwealth* v. *Young*, 7 B. Mon. 1 ; *The State* v. *Johnson*, Walk. (Miss.) 392 ; *Greeson* v. *The State*, 5 How. (Miss.) 33 ; *The State* v. *Foster*, 61 Mo. 549 ; *The State* v. *Kean*, 10 N. H. 347 ; *The State* v. *Washington*, 1 Bay, 120 ; *The State* v. *Anthony*, 1 McCord, 182.    In *Lopez* v. *The State*, 19 Mo. 244, the conclusion was " against the peace of the *statute*, and of the statute in such cases made and provided," — a conclusion very similar to the one in this case, and the indictment was held bad.

We have found but two cases where such defects were held mere matters of form.    In *Cain* v. *The State*, 7 Blackf. 612, an indictment concluding " against the peace of the State " was permitted by the court to be amended by the prosecuting officer so as to read " against the peace and dignity of the State."    The other case is that of *The Commonwealth* v. *Paxton*, Court of Quarter Sessions of Chester County, Pennsylvania, published in the *Legal Intelligencer* (Philadelphia), November 14, 1879, where it was held that the words " against the peace and dignity of the Commonwealth of Pennsylvania " are words of form and not of substance, and that the fact that they are required by the constitution makes them no less so.

Our opinion is that the constitutional conclusion is one both of form and substance combined, — substance because

the Constitution requires it; and may be availed of at any time.

For the reason that illegal and inadmissible evidence was allowed to go to the jury, over objections of defendants, and because the indictment is fatally defective, the judgment of the court below is reversed and the cause remanded.

*Reversed and remanded.*